**UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **GEORGE R. MICHELL, MICHELL NORTH LLC, MICHELL.BRADLEY LLC, BERLIN FOODS, LLC, and UTICA FOODS, LLC,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**McDONALD'S CORPORATION, and McDONALD'S USA, LLC, JOSEPH CHICZEWSKI, JEFF ROTH, and JOHN CRONAN**<br><br>**Defendants.** | **Civil No.:**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiffs George R. Michell, Michell North LLC, Michell.Bradley LLC, Berlin Foods, LLC, and Utica Foods, LLC, by their attorneys, complain against Defendants McDonald's Corporation and McDonald's USA, LLC (collectively "McDonald's), Joseph Chiczewski, Jeff Roth, and John Cronan:

## NATURE OF CASE

1. George R. Michell ("George Michell" or "Michell"), a Hispanic American, is one of the most successful Owner/Operators in the McDonald's franchised restaurant system. Michell owns and operates thirty-seven (37) McDonald's restaurants in New York, Connecticut, Massachusetts, and New Jersey. In addition, by agreement with McDonald's, Michell developed, owns, and operates eight non-McDonald's restaurants and bars (sometimes known in McDonald's parlance as "Special Venues") at Bradley International Airport in Windsor Locks, Connecticut ("Bradley Airport" or the "airport").

2. McDonald's is wrongfully scheming to drive Michell out of the McDonald's franchise system, and to usurp the substantial equity value of these restaurants from Michell and his family. To accomplish this scheme, McDonald's has announced that it will not renew five of Michell's McDonald's restaurants in New York and Connecticut as their franchise terms expire in 2025, 2026, and 2027, and McDonald's threatens to not renew Michell's remaining McDonald's restaurants as their franchise terms expire in future years beginning in 2028. McDonald's claims Michell is ineligible for franchise renewals based on his alleged failure to comply with McDonald's recently revised "National Franchising Standards." But McDonald's is basing this conclusion on a series of bad faith, pretextual allegations that are false or greatly exaggerated, arbitrary, capricious, discriminatory against Michell as a Hispanic American, and retaliatory. Without limitation:

A. McDonald's is attempting to retroactively apply new National Franchising Standards that became effective on January 1, 2023, to alleged conduct in 2021 and 2022 that did not violate the Company's standards then in existence.

B. Under its new National Franchising Standards (and in particular, the "Owner/Operator Involvement Standard") that became effective on January 1, 2023, McDonald's appoints itself judge, jury, and executioner that may deny franchise renewals to successful Owner/Operators for subjective reasons that are arbitrary, capricious, unfair, unreasonable, inconsistent, discriminatory, or retaliatory.

C. McDonald's fraudulently omitted to disclose its intent to drastically change the National Franchising Standards, and their application, when it was demanding in recent years that Michell (and all other Owner/Operators) reinvest in their

McDonald's restaurants at unprecedented levels under the Company's Bigger Bolder Vision 2020 ("BBV 2020") program.

D. McDonald's, through the individual Defendants at McDonald's field office in Stamford, Connecticut, is misstating facts in a malicious effort to build a phony case against Michell under the new National Franchising Standards that, by McDonald's intent and design, invite this type of arbitrary and capricious conduct.

E. McDonald's is discriminatorily applying its recently revised National Franchising Standards in violation of the federal Civil Rights Act, 42 U.S.C. §1981.

3. McDonald's actions threaten Michell with substantial economic loss. In 2023, Michell's McDonald's restaurants generated over $158,000,000 in revenue. These restaurants are fully modernized and comply with McDonald's standards in appearance, décor, equipment, and technology etc., and this is true because, at McDonald's insistence, Michell has expended more than $20 million in recent years as he complied with McDonald's demands for historically unprecedented reinvestment from its Owner/Operators to meet the Company's evolved standards for restaurant appearance, décor, equipment, and technology etc.

4. To increase the pressure on Michell to sell his McDonald's restaurants at fire sale prices, McDonald's is engaging in further malicious conduct intended to inflict collateral injury on Michell and his family that shocks the conscience and should outrage every McDonald's franchisee and shareholder.

A. McDonald's is unfairly and discriminatorily punishing Michell's daughter (and managerial employee) Larisa Michell, by holding her future as a qualified "Next Generation" Owner/Operator hostage until George Michell waves the white flag of surrender and allows McDonald's to steal the value of his businesses from him.

Only then will McDonald's, by its express declarations, let Larisa become a franchisee herself; and

B. McDonald's seeks to force Michell out of the non-McDonald's Special Venue restaurants/bars that Michell operates at Bradley Airport. On April 20, 2024, McDonald's (speaking through Defendant Joseph Chiczewski) declared that it would prefer to lose the continued presence of a McDonald's restaurant in the Bradley Airport concourse (and lose McDonald's revenue stream from the Special Venues) rather than let Michell remain a McDonald's franchisee at that airport or anywhere else; and McDonald's/Chiczewski threatened legal action against Michell if he remains the operator of these Special Venues without McDonald's consent.

5. George Michell is a self-made man, proud of his heritage as a Hispanic American, who built his McDonald's and non-McDonald's businesses over 34 years of hard work and dedication to the McDonald's brand, to his employees, and to the communities in which his establishments serve. Before the events alleged in this Complaint, Michell had no reason to believe his longstanding franchise and Special Venue relationships with McDonald's were in jeopardy. Michell protested that McDonald's actions are wrongful and discriminatory against a successful Hispanic Owner/Operator, but McDonald's retaliated by doubling-down on its campaign to manufacture pretextual grounds to drive Michell out of the system.

6. To protect his family, his employees, and his legacy as a successful Hispanic business owner being subjected to unconscionable and disparate treatment Michell brings state law claims under statute and common law, and for violation of his civil rights under 42 U.S.C. §

1981. Michell seeks actual and punitive damages, declaratory and injunctive relief, and all other relief available under law.

## PLAINTIFFS

7. Plaintiff George R. Michell ("Michell") is a Mexican American citizen living in New Canaan, Connecticut. Through various operating companies, Michell has been a McDonald's Owner/Operator since 1990. He owns and operates thirty-seven (37) McDonald's restaurants in New York, Connecticut, Massachusetts, and New Jersey. His McDonald's restaurants are consistently recognized as top tier performers in his geographic area (that currently fall under the domain of McDonald's field office in Stamford, Connecticut).

8. Michell is the principal member of four corporate plaintiffs named in sub-paragraphs 8 (a) - (d), which own and operate five of his franchised McDonald's restaurants:

a. Plaintiff Michell North LLC is a Delaware limited liability company with its principal place of business in New York. It owns and operates two McDonald's restaurants that Michell acquired in November 2009:

   i. McDonald's Store #11727 at 1814 Central Ave, Albany, New York 12205, at premises sub-leased from McDonald's.[1] The franchise agreement for this restaurant will expire, if not renewed by McDonald's, on June 27, 2025.

   ii. McDonald's Store #10953 at 3700 State St. Schenectady, New York 12304, at premises leased from McDonald's. The franchise agreement for this restaurant will expire, if not renewed by McDonald's, on December 28, 2025.

[1] McDonald's assigns a "Store #" to each McDonald's restaurant.

b. Plaintiff Michell.Bradley LLC ("Michell.Bradley") is a Connecticut limited liability company with its principal place of business at Bradley Airport in Windsor Locks, Connecticut, where it owns and operates the McDonald's restaurant in the airport concourse as McDonald's Store #28784. Michell acquired this McDonald's restaurant in 2003, and through his operating company, he subleases the restaurant premises from McDonald's, which holds a master concessionaire lease(s) from the Connecticut Airport Authority for these locations. Michell's franchise agreement (and sub-lease) for this McDonald's restaurant will expire, if not renewed, on January 31, 2025.

c. Plaintiff Berlin Foods LLC is a Connecticut limited liability company with its principal place of business in Connecticut. It operates one McDonald's restaurant (McDonald's Store #148) at 2375/2355 Berlin Turnpike Newington, Connecticut 06111, on premises it leases from McDonald's. Michell acquired this restaurant on or about August 22, 2001. The franchise agreement for this restaurant will expire, if not renewed by McDonald's, on December 28, 2026.

d. Plaintiff Utica Foods LLC is a New York limited liability company with its principal place of business in New York. It owns and operates one McDonald's restaurant (McDonald's Store #11542) at 1656 Utica Avenue, Brooklyn, New York 11234 in premises subleased from McDonald's. Michell acquired this restaurant in August 2017. The franchise agreement for this McDonald's restaurant will expire, if not renewed by McDonald's, on November 19, 2027.

9. In addition to the limited liability company plaintiffs named in paragraph 8, Michell is the principal member of other privately held companies that own and operate his other franchised

McDonald's restaurants. The other members of Michell's operating companies that own and operate his McDonald's restaurants are family members or trusts that Michell has established to benefit his family.

10. Plaintiff Michell.Bradley, named in paragraph 8(b), also developed, owns, and operates eight non-McDonald's restaurants/bars at Bradley Airport, (collectively the "Special Venues" or "Bradley Airport Special Venues"):

1) Fresh City (McDonald's Store #30494).
2) Papa Gino's Pizza (McDonald's Store #30495).
3) D'Angelos Grilled Sandwiches (McDonald's Store #35503)
4) Black Bear Saloon (McDonald's Store #34394).
5) Cask & Barrel Bistro (McDonald's Store #34514).
6) Phillips Seafood Restaurant (McDonald's Store #35028)
7) Two Roads Taproom (McDonald's Store #30497).
8) TravelTini (McDonald's Store #35504).

11. McDonald's leases the premises for each Bradley Airport Special Venue from the Connecticut Airport Authority and sub-leases those premises to Michell.Bradley at higher rents generating profit to McDonald's. These subleases will expire, if not renewed, on January 31, 2025.

12. All acts and omissions by Defendants directed at Michell personally are also directed at the particular Michell operating company for the specific McDonald's restaurant(s) or Special Venues impacted by the act or omission; and all acts and omissions by Defendants directed at a particular Michell operating company for specific McDonald's restaurant(s) or Special Venues are also directed at Michell personally. Collectively, Michell and his operating companies are referred to in McDonald's parlance, and in this Complaint, as the "Michell Organization."

## DEFENDANTS

13. McDonald's Corporation ("McDonald's Corp.") is a Delaware corporation with its principal place of business in Chicago, Illinois. Through subsidiaries, it owns or franchises

McDonald's restaurants worldwide. McDonald's Corp. has significant involvement in, and control over the business affairs of its subsidiaries including McDonald's USA including all or part of the conduct and decision-making concerning the McDonald's restaurant system in the United States that has caused or enabled the conduct of its subsidiary giving rise to this Complaint.

14. Defendant McDonald's USA, LLC ("McDonald's USA") is a Delaware limited liability company and a subsidiary of McDonald's Corp. sharing headquarters in Chicago, Illinois with McDonald's Corporation, that operates and franchises McDonald's restaurants in the United States. (Together, the corporate defendants are "McDonald's" or the "Company" unless otherwise indicated).

15. Defendant Joseph Chiczewski ("Chiczewski") is a Field Vice-President for McDonald's at its field office in Stamford, Connecticut. All of Michell's franchised McDonald's restaurants are in geographic areas under Chiczewski's domain.

16. Defendant Jeff Roth ("Roth") is an Operations Officer for McDonald's. From July 2018 through September 30, 2020, Roth was Michell's "Franchise Business Partner" on behalf of McDonald's. From October 2020 through January 15, 2024, Roth was McDonald's Operations Officer for the Empire and New England Co-Ops in which some of Michell's franchised McDonald's restaurants participate. On January 16, 2024, Roth became McDonald's Operations Officer for the New York Metro and Susquehanna Co-Ops where some of Michell's McDonald's restaurants participate.

17. Defendant John Cronan ("Cronan") was McDonald's Operations Officer for the New York Metro and Susquehanna Co-Ops (in which some of Michell's franchised McDonald's restaurants participate) from November 2021 through December 2023, when McDonald's transferred him to a new position in California.

18. Under *respondeat superior*, the acts and omissions by McDonald's officers, employees, and agents, including but not limited to Chiczewski, Roth, and Cronan, are alleged against McDonald's.

## JURISDICTION

19. The Court has federal question jurisdiction under 28 U.S.C. §1331, 42 U.S.C. §1981 and 42 U.S.C. §1988; and the Court has supplemental jurisdiction over Michell's state law claims arising from a common nucleus of operative facts.

## VENUE

20. Under 28 U.S.C. § 1391(b), venue in the Eastern District of New York is proper since a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

21. From one McDonald's restaurant franchise in 1953, today there are over 40,000 McDonald's restaurants doing business world-wide and about 95% are franchised to Owner/Operators such as Michell.

22. At most franchised McDonald's restaurants in the United States including those owned and operated by Michell, McDonald's retains ownership (or long-term leases) of the real estate and leases (or subleases) it to the Owner/Operator in exchange for the payment of rent.

23. The McDonald's franchise agreement is the contract that establishes and governs the franchise relationship between McDonald's and its franchisees.

24. Since 1990 (when Michell entered this franchise system) or earlier, McDonald's drafts its franchise agreements and does not negotiate their terms with individual Owner/Operators.

25. Most McDonald's Owner/Operators including Michell have signed McDonald's "conventional" franchise agreement that, since 1990 or earlier, have been contracts of adhesion.

These franchise agreements usually provide for a 20-year term. Exceptions are sometimes made, for example, to conform to an applicable lease that might have a shorter term.

26. McDonald's franchise agreements give McDonald's vast discretionary power over the economic success of its Owner/Operators. This creates an inherent potential for abuse and intimidation by McDonald's. Michell and other McDonald's Owner/Operators must trust McDonald's to be honest, reasonable, fair, consistent, non-discriminatory, non-retaliatory, even-handed, and to act in good faith.

27. McDonald's delegates substantial responsibility and discretionary decision-making authority to field office management throughout the United States. Michell and other Owner/Operators must trust McDonald's field officers and their staffs to be honest, reasonable, fair, consistent, non-discriminatory, non-retaliatory, even-handed, and to act in good faith.

28. Section 12 of Michell's franchise agreements with McDonald's require him to operate his franchised McDonald's restaurants in compliance with the "McDonald's System" as defined by McDonald's. This duty extends to every aspect of McDonald's restaurants, including without limitation: quality, service, and cleanliness, menu, décor, signage, appearance (interior, exterior, and landscaping), equipment, technology, hours of service, means of service (*e.g.*, drive-through, delivery, dining room), employee training and staffing levels; and advertising, etc.

29. Section 18 of Michell's franchise agreements with McDonald's define the events that would be a "material breach" that could cause McDonald's to terminate the franchise agreement; and Section 19 states that McDonald's can terminate the franchise agreement if the franchisee commits "repeated [material] breaches" of the franchise agreement not covered in Section 18.

30. Section 28(a) of Michell's franchise agreements provides that McDonald's makes "no promise or representation as to the renewal of this Franchise Agreement or the grant of a new franchise;" and Section 28(h) provides that "[n]o future franchise or offers of franchises for additional McDonald's restaurants, other than this franchise, have been promised to franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Offer Letter."

31. Consistent with these cited provisions in each franchise agreement creating the possibility of renewal or rewrite, McDonald's implemented a course of dealing whereby the Company grants new 20-year franchise terms (previously called "rewrite", but now called "New Term" by McDonald's) to Owner/Operators who comply with the Company's defined "New Term Policy" (and when the particular restaurant location remains available and desirable). McDonald's benefits from this course of dealing, which McDonald's implemented early in its history, as the prospect of franchise renewal gives Owner/Operators the incentive to reinvest in their restaurants and maintain the highest standards of quality, service, and cleanliness, even as their franchises near expiration.

32. As a central component of its established course of dealing on franchise renewals, McDonald's publishes "National Franchising Standards" and offers franchise renewals to Owner/Operators who maintain compliance with these standards. By McDonald's design and intent, Owners/Operators strive to comply with the National Franchising Standards to remain eligible to obtain franchise renewals upon the expiration of a franchise term (and/or acquire additional McDonald's restaurant franchises during term); and from time to time, McDonald's has revised its National Franchising Standards.

33. As part of its established course of dealing, McDonald's would inform an Owner/Operator of objective requirements the Owner/Operator must meet to cure any deficiency in complying with the National Franchising Standards.

34. As part of its established course of dealing, McDonald's designates an Ombudsman who can try to resolve disagreements that inevitably arise from time to time in franchise relationships. The McDonald's Ombudsman program has historically been successful in resolving franchising disagreements without litigation.

35. As part of its established course of dealing, McDonald's strives to maintain the independent contractor status of its Owner/Operators and to avoid becoming a joint employer of its Owner/Operators' employees; and to avoid the appearance of setting retail prices at franchised restaurants.

36. Section 15 of Michell's franchise agreements require him to obtain McDonald's approval before selling his franchised McDonald's restaurants to other existing or prospective Owner/Operators. This provision confers discretionary power upon McDonald's to affect the price a selling Owner/Operator may receive for his or her franchised McDonald's restaurant. Without limitation:

a. McDonald's might not approve a proposed sale to a particular buyer at any price (and in recent years McDonald's has implemented a "growth policy" that limits the pool of potential buyers among existing Owner/Operators).

b. McDonald's might not approve a proposed sale at an intended price.

c. McDonald's can depress the price a reasonable buyer might pay for a franchised McDonald's restaurant if it becomes known that McDonald's has declared the seller ineligible for franchise renewal.

d. McDonald's can create a fire-sale atmosphere that harms an Owner/Operator who wishes, or McDonald's is pressuring, to sell.

37. As part of its established course of dealing, McDonald's offers the adult children of existing Owner/Operators who have worked in the restaurants to become next generation ("Next Gen") Owners/Operators by meeting defined qualifications.

**The Success of the Michell Organization**

38. From 1990 through 2017, Michell acquired multiple McDonald's restaurants including thirty-seven (37) that he continues to own and successfully operate. This is a considerable accomplishment as relatively few McDonald's Owner/ Operators acquire ten (10) or more McDonald's restaurants.

39. Michell entered the McDonald's franchise system understanding and agreeing to the written franchise agreement(s) and the established course of dealing.

40. Since 1990, before the events alleged in this Complaint, Michell had the reasonable expectation McDonald's would exercise its discretion under the franchise agreements in ways that are honest, reasonable, fair, consistent, non-discriminatory, non-retaliatory, even-handed, and to act in good faith.

41. Michell and his companies have consistently been top quintile performers in comparisons among multi-unit McDonald's restaurant owners the Company routinely publishes. Being top quintile of multi-unit McDonald's Owner/Operators is a major accomplishment in the McDonald's system and it means that his McDonald's restaurants have substantial economic value.

42. In building his portfolio of McDonald's restaurants, Michell has consistently worked hard to cultivate good business relations with McDonald's and with the Company's

encouragement, he viewed the franchise relationship as a partnership in which franchisor and franchisee work together to enhance the brand's reputation in the markets that Michell served, and to mutually profit.

43. Michell's history with McDonald's shows consistent growth, leadership, willingness to invest and innovate, the courage to take on challenging restaurants and non-traditional concepts, dedication to the McDonald's brand, a track record of substantial and continuing reinvestment in his restaurants, and a track record of successful business results and business relationships.

44. Moreover, the Michell Organization strives to be a good corporate citizen and a generous employer.

**The Bradley Airport Special Venues**

45. Expending great time, effort, and financial resources, and also working with non-McDonald's business partners, Michell and Michell.Bradley developed, own, and operate the Special Venues at Bradley Airport alleged in paragraph 10:

1) Fresh City (McDonald's Store #30494) serves salads, wraps, and stir fry and offers vegan options.

2) Papa Gino's Pizza (McDonald's Store #30495) serves pizza.

3) D'Angelos Grilled Sandwiches (McDonald's Store #35503) serves other grilled sandwiches (not hamburgers or chicken sandwiches like McDonald's) and salads.

4) Black Bear Saloon (McDonald's Store #34394) is a sports bar serving pub food.

5) Cask & Barrel Bistro (McDonald's Store #34514) is a bar serving pub food such as fish-n-chips.

6) Phillips Seafood Restaurant (McDonald's Store #35028) is a regional chain serving crab cakes and "Maryland style" seafood and also serves alcohol.

7) Two Roads Taproom (McDonald's Store #30497) is a bar serving locally brewed craft beers and offering pub food.

8) TravelTini (McDonald's Store #35504) is a high-end bar that also serves pub food.

46. Michell and Michell.Bradley developed these Special Venues at McDonald's request and with McDonald's encouragement after McDonald's entered into a master lease with the Connecticut Airport Authority that permitted the opening of a McDonald's restaurant and required other restaurants and bars, offering diverse food and beverages, throughout the airport concourse.

47. McDonald's needed an Owner/Operator who was qualified, ready, willing, and able to operate a McDonald's restaurant *and* develop and operate the Special Venues to the satisfaction of the Connecticut Airport Authority. Michell accepted this role and has performed well. Michell's Special Venues generated almost $12,000,000 in revenue in 2023 and are profitable for all concerned parties including McDonald's which receives premium rent payments from Michell for the Special Venues.

48. At all relevant times, for each of his McDonald's restaurants, and for each Bradley Airport Special Venue, Michell and his operating companies have performed or substantially performed all of their obligations under their franchise agreements and other contracts; and McDonald's has never asserted material breach by Michell of any of his franchise agreements or other contracts; and has never attempted to terminate any of his franchises or other contracts during their terms.

49. McDonald's never refused to renew any of Michell's franchise agreements or other contracts before the events alleged in this Complaint.

**<u>Michell's Success as a Minority Owner/Operator</u>**

50. Michell's heritage as a Mexican American is well-known to McDonald's, as Michell is active in the McDonald's Hispanic Owner/Operators Association ("MHOA"), and the Michell Organization has been and remains one of the largest Hispanic Owner/Operators of McDonald's restaurants in the United States.

51. McDonald's over the years has devoted public relations resources in promoting Michell as a praiseworthy example of how minorities can succeed in McDonald's franchise ownership. For example, Michell has been featured in Albany's Latino Magazine as a McDonald's Hispanic Leader and in Univision segments on Hispanic Heritage; and he has been presented as a McDonald's success story on CNBC and in the Wall Street Journal; and the Michell Organization was featured by McDonald's on the front page of McDonald's Management News.

**<u>Larisa Michell</u>**

52. Larisa Michell, the adult daughter of George Michell, has extensive managerial experience in the Michell Organization's restaurants and was qualified to enter into the Company's "Next Generation" program whereby the children of successful Owner/Operators may become restaurant owners themselves.

53. Larisa Michell was and remains qualified to become a Next Generation owner/operator of multiple McDonald's restaurants.

**<u>Bigger Bolder Vision 2020</u>**

54. In or about 2017, McDonald's announced a new program, "Bigger, Bolder Vision 2020" ("BBV 2020") whereby McDonald's required its Owner/Operators in the USA to make

large and unprecedented reinvestments in their restaurants to conform to the Company's evolving visions for the brand in terms of restaurant appearance and technology, without limitation.

55. In announcing BBV 2020 during a meeting at its headquarters in Chicago, the president of McDonald's USA explained (in substance) that BBV 2020 was a new direction for McDonald's, that Owner/Operators who did not embrace the new vision and reinvest at the required levels should leave, but Owner/Operators who participated would be rewarded over the long term as McDonald's valued business partners.

56. After announcing BBV 2020, McDonald's continued to impose new requirements in technology and other categories that have required more reinvestment by its Owner/Operators.

57. In announcing BBV 2020 and other programs since 2017, McDonald's did not provide its Owner/Operators with projected returns on investment (ROI), a fact that, among others, generated controversy among McDonald's franchisees. McDonald's demanded that its Owner/Operators trust the Company's leadership in imposing these mandatory new spending programs.

58. Michell agreed to place his trust in McDonald's and embraced BBV 2020. Since 2017, Michell and his various operating companies spent over $20 million in improvements to 36 of their franchised McDonald's restaurants to meet new requirements announced by McDonald's:

a. Only one of Michell's McDonald's restaurants (McDonald's Store #13068, at 880 Coney Island Avenue, Brooklyn, New York), was not included in this reinvestment due to its then-pending lease expiration.

At McDonald's Store #148, at 2375/2355 Berlin Turnpike Newington, Connecticut 06111 (identified in paragraph 8(c)), Michell continued to reinvest in this franchised restaurant in 2022 to meet McDonald's requirements at that location, in

addition to having reinvested in that location in 2018 to meet McDonald's requirements

59. On or about April 19, 2022, McDonald's, through Defendant John Cronan and Stephen Monahan, the Franchise Business Partner assigned to Michell, informed Michell in a written Business Review Report that Michell met all of McDonald's then-applicable National Franchising Standards and was eligible "for growth and rewrite."

60. After his receipt of the April 19, 2022 Business Review Report, Michell remained eligible for growth and rewrite and, as intended by McDonald's, Michell continued to rely on his eligibility as he continued to invest in his restaurants in ways that benefitted McDonald's and his organization.

**McDonald's Changes Its New Term Policy and**
**<u>National Franchising Standards</u>**

61. In or about June 2022, McDonald's announced that its historic "rewrite" practices would be replaced by a new "New Term" policy that (on information and belief) the president of McDonald's USA claimed would bring "greater clarity, transparency and consistency" to franchise renewal decisions.[2]

62. In the same announcement in June 2022, McDonald's informed the Owner/Operators that there would be new National Franchising Standards that "will go into effect on January 1, 2023."

---

[2] See https://www.restaurantbusinessonline.com/financing/mcdonalds-toughening-its-franchise-ownership-standards (June 23, 2022) (screenshot May 8, 2024) (submitted as Exhibit A).

63. On information and belief, many McDonald's Owners/Operators criticized the new "New Term" policy, but not Michell, who did not perceive a threat to his McDonald's restaurants; and who has always strived to cooperate with the company.

64. The revised National Franchising Standards that went into effect on January 1, 2023, do not bring "greater clarity, transparency and consistency" to franchising or franchise renewal decisions. To the contrary, the revised National Franchising Standards expose Owner/Operators to a materially increased risk of arbitrary, capricious, subjective, inconsistent, abusive, and discriminatory decision-making by McDonald's, or by its field officers who exercise proverbial life and death power over Owner/Operators.

65. Effective January 1, 2023, the National Franchising Standards have six parts:

1) Building The Business Through Guest Satisfaction Standard.
2) Operations Standard.
3) People Standard.
4) Owner/Operator Involvement Standard.
5) Financial Standard.
6) Reinvestment Standard.

66. By McDonald's intent and design, the revised "Owner/Operator Involvement Standard" is extremely subjective in ways that expose an Owner/Operator to the whims of McDonald's field officers who might unilaterally determine (without limitation) that an Owner/Operator:

a. Fails to maintain a "*mutually beneficial working relationship with McDonald's Company staff.*"

b. Fails to be sufficiently "*participating*" and "*positive*" when attending various business or team meetings.

c. Fails to *"act with the highest standards of honesty, integrity, courtesy, professionalism, and ethical conduct in all direct and indirect dealings with the*

*Company ... and in all situations where the Brand could be connected to the Owner/Operator's conduct.*

d. Fails to "*communicates in a timely, open, and transparent manner, especially regarding issues that impact the Brand.*"

e. Fails to be sufficiently "*collaborative* and *constructive*" and … "*gain the trust and support* of other Owner/Operators, suppliers, and the Company alike …"

67. This quoted language from the current Owner/Operator Involvement Standard is inherently subjective and thus subject to abusive, discriminatory, arbitrary, capricious, and inconsistent interpretation and/or application by McDonald's in its field offices or at corporate headquarters.

68. By McDonald's intent and design, McDonald's has purported to empower itself and its local field officers to be judge, jury and executioner of an Owner/ Operator's career with McDonald's and the equity in his or her McDonald's restaurants:

a. Based on inherently subjective and potentially arbitrary, capricious, retaliatory, or discriminatory whims.

b. Without regard to an Owner/Operators' performance under objective metrics such as sales volume, lack of customer complaints, or McDonald's QSC standards, etc.

c. Without regard to the Owner/Operators' reinvestments in a particular restaurant in reliance on the prospects for renewal under the previously established course of dealing.

d. Even where there is no contention that the Owner/Operator materially breached the applicable franchise agreement(s).

69. For Owner/Operators such as Michell who own multiple McDonald's restaurants, McDonald's can declare him ineligible for renewal at any of his locations even if there was no alleged violation of the Owner/Operator Involvement Standard at that location.

70. In contrast to other National Franchising Standards that set objective requirements, standards, McDonald's has published no guidelines to ensure consistent, non-abusive, and non-discriminatory interpretation and/or application of the subjective Owner/Operator Involvement Standard; or to allow an Owner/Operator to cure a determination that he or she is not complying with the subjective Owner/Operator Involvement Standard.

71. Michell did not agree in any franchise agreement (or any other agreement) that McDonald's could engage in arbitrary, capricious, retaliatory and/or discriminatory decision-making by field officers or at the corporate headquarters under a subjective Owner/Operator Involvement Standard that could cause his loss of equity in the business he has successfully built since 1990.

**<u>The Company's Abusive and Disparate Treatment of Michell</u>**

72. On or about November 29, 2022, Michell (accompanied by Larisa Michell and Tyrone Davis (Senior Director of Operations for the Michell Organization)), met with individual Defendants Chiczewski and Cronan at the Teaneck Marriott hotel after a routine regional business co-op meeting. On this occasion:

a. Chiczewski told Michell that he (Chiczewski) wants Michell out of the system and that Michell needs to sell all of his McDonald's restaurants.

b. Chiczewski told Michell and Larisa Michell that Larisa would have to apply to become an Owner/ Operator through the "Registered Applicant" program that is available to members of the general public who wish to become McDonald's

franchisees (and not as a Next Gen candidate). This decision was wrong, and was disparate treatment, because under McDonald's established rules, Larisa should have been given 12 months to cure any alleged issues before she was removed from Next Gen (assuming there was cause to threaten to remove her in the first instance, but McDonald's had no such cause).

c. Chiczewski presented Michell with a written offer to purchase all of his McDonald's restaurants at a price far less than fair market value.

d. Chiczewski rejected attempts by Michell to negotiate a partial sale of his restaurants, which was intended as possible good faith comprise, and not as an admission of any guilt.

e. Chiczewski reiterated that Michell must leave the system, and if he did not agree to sell all his restaurants, he would lose all his restaurants one by one as their terms expire.

73. The conduct of McDonald's and Chiczewski on November 29, 2022 was indefensible and came as a shock to Michell and Larisa Michell. Michell did not agree to McDonald's demands, but out of concern for his daughter he attempted after November 29, 2022, to negotiate with McDonald's, but without success. In their arrogant belief they are the potentates and Michell is a mere (Hispanic) franchisee, Defendants doubled down after November 29, 2022, in their arbitrary, capricious, and discriminatory efforts to drive Michell out of this franchise system.

74. On multiple occasions after November 29, 2022, continuing into 2024, Chiczewski and/or Cronan confirmed that McDonald's demand is that Michell leave the McDonald's system completely before Larisa Michell is allowed to become an Owner/Operator; and that Chiczewski

will continue to deny new franchise terms to Michell for as long as he remains in charge of the Stamford Field Office.

**The Municipal Labor Law Case**

75. On or about November 1, 2022, with no advance notice to Michell, a media outlet reported that Michell had entered into an agreement with New York City to settle a claim that his companies had violated the municipal Fair Workweek Law and Earned Safe Time and Sick Time Act at McDonald's restaurants within New York City. This media story vanished quickly and was not the subject of recurring reporting. There was no noticeable decline in business volume after the story appeared.

76. McDonald's and Chiczewski later claimed that this November 2022 media story and Michell's preceding settlement of the municipal labor law case established a violation by Michell of the Owner/Operator Involvement Standard (that was not effective until January 1, 2023), because Michell had failed to give McDonald's notice of the labor law case before the media reported the settlement. However, McDonald's was being arbitrary, capricious, unfair, and discriminatory because:

a. McDonald's had no basis to contend that pre-2023 events violated a new standard that was not effective until January 1, 2023.

b. No provision of Michell's franchise agreements required Michell to notify McDonald's of this labor law case or to obtain McDonald's approval to settle it.

c. McDonald's could identify no prior communications putting Michell on notice that McDonald's had expected to be notified about municipal labor law case(s). To the contrary, McDonald's has consistently communicated its desire to be insulated

from labor issues in its franchised restaurants for fear it will be classified as a joint employer of the Owner/Operator's employees.

d. Michell's alleged violations of the cited municipal labor laws were not intentional as these laws create record-keeping requirements that were beyond the capability of Michell's software (that McDonald's had recommended to Michell); and Michell had taken steps to avoid a recurrence of these problems; and

e. On information and belief, Michell was not the first Owner/Operator to have a municipal case or to have a legal issue reported in the media. Michell is not aware of other Owner/Operators charged with violating a National Franchising Standard over an occurrence comparable to this case.

**The January 11, 2023 Change of Status Letter**

77. In a "Change of Status" letter dated January 11, 2023, Defendant Chiczewski, McDonald's Field Vice President in the Stamford Field Office, speciously alleged that Michell has a "*history*" of "*repeated inability to properly communicate and be collaborative with the Stamford Field Office*" such that, in McDonald's opinion, Michell supposedly "no longer [met] the National Franchising Standards."

78. Chiczewski used this Change of Status letter to announce that the Field Office was recommending Michell be declared ineligible for renewal and to confirm Larisa Michell's removal from the Next Gen program.

79. McDonald's assertion that Michell violated a National Franchising Standard based on the 2022 municipal labor case (and its punishment of Larisa Michell) was wrongful, but this was only the beginning of McDonald's pretextual scheme to manufacture false grounds to expel Michell from the franchise system and steal Michell's hard-earned equity in his business.

80. As his purported support for this subjective conclusion that Michell did not meet the National Franchising Standards, Chiczewski cited the municipal labor case discussed above; and retroactively cited communications that occurred in 2021 and 2022, which McDonald's had not previously contended to violate the National Franchising Standards then in existence.

81. Had Michell violated a National Franchising Standard in 2021 or 2022, McDonald's should, and would have informed Michell of that conclusion in Michell's next annual Business Review (if not sooner).

82. In purporting to retroactively apply the new National Franchising Standards, Chiczewski was engaged in a malicious campaign to declare Michell ineligible for his upcoming franchise renewals based on false, pretextual, arbitrary, capricious, and discriminatory reasons.

83. At the risk of giving the 2021/2022 communications that Chiczewski retroactively cited in January 2023, more attention than they deserve, the contention that these earlier communications established grounds to declare Michell in violation of *any* National Franchising Standard lacks merit because:

a. There was no accusation in the 2021 or 2022 communications (or the 2023 retroactive citing of them) that any statement by Michell was false.

b. In the 2021/2022 communications that Chiczewski retroactively cited in January 2023, the "criticism" was that Michell needed time after meetings with field office staff to investigate the answers to questions or concerns raised in the meetings as opposed to giving *real time* answers in haste. This retroactive criticism, that an Owner/Operator wanted to be sure he had his facts right, and to not give McDonald's erroneous information, is arbitrary and capricious.

84. Michell protested the January 11, 2023, Change of Status Letter to no avail. Without limitation, Michell pointed out the fact that two white Owner/Operators (Tom Parker and Paul Hendel) had settled with New York City after being charged with comparable labor law violations, and their cases had generated similar media publicity, but to Michell's knowledge, McDonald's had not sanctioned them. McDonald's ignored and did not attempt to refute Michell's claim of racially disparate treatment.

85. Nor did McDonald's explain how non-communication about the municipal labor law case could violate the National Franchising Standards where the Company knew of past (actual or alleged) labor law violations and/or settlements, but never demanded that it be informed of these cases.

86. Nor did McDonald's ever try to justify its revisionist escalation of pre-2023 communications and events into retroactively asserted violations of the National Franchising Standards that had not been cited against Michell in two preceding annual Business Reviews.

87. It was *obvious* that (A) by November 2022, McDonald's and Chiczewski had unfairly targeted Michell for elimination and for forfeiture of the equity and profits in his highly successful multi-restaurant organization; (B) by January 11 2023, McDonald's and Chiczewski were determined to build an alleged "case" against Michell to justify their outrageous position and coerce Michell into surrendering; and (C) McDonald's had pretextually seized upon its revised standards that were not in existence at the time of Michell's alleged infractions.

88. Based on the January 2023 Change of Status Letter, Chiczewski and the McDonald's Field Office recommended that the Company's New Term Committee deny renewal to the four McDonald's restaurants identified in paragraphs 8 (a), (b), and (c) and to similarly deny renewal to Michell's eight (8) non-McDonald's Special Venues at Bradley Airport identified in

paragraph 10. None of these four McDonald's restaurants had been part of the New York City labor case. McDonald's identified no operational issues, and no breaches of the franchise agreement, regarding these four restaurants. McDonald's identified no criticisms as to the way Michell successfully owns and operates his McDonald's restaurants at these locations and likewise alleged no criticisms of his operations of the Bradley Airport Special Venues.

**The Coney Island Avenue Board of Health Incident**

89. On or about July 5, 2023, after McDonald's malicious scheme to drive Michell out of the McDonald's system was well underway, the New York City health department briefly closed Michell's McDonald's restaurant at 880 Coney Island Avenue, Brooklyn, New York (McDonald's Store #13068), after a walk-in refrigerator broke down. This incident, while regrettable, was not unusual in the quick service restaurant world. This restaurant had not been included in the recent wave of reinvestments because its lease was expiring, and hence an old refrigerator failed without warning. The refrigeration was quickly corrected, the restaurant quickly re-opened, and it remains open. This time, because the franchise agreement requires the restaurants to be open, the Michell Organization promptly told McDonald's about the closure and kept the Company posted as it quickly re-opened. But despite Michell's timely communication, McDonald's misrepresented this event to add to its false narrative that Michell has a history of allegedly failing to properly communicate with the Company in violation of the Owner/Operator Involvement Standard.

90. On July 21, 2023, McDonald's wrongfully accused Michell of "lack of candor in disclosing the full nature" of the violations cited by the New York Department of Health in mentioning the refrigerator but failing to mention that the inspector also found mice droppings and filth flies. But McDonald's was wrong:

a. The only reason Store #13068 on Coney Island Avenue was temporarily closed was the malfunctioning refrigerator. Some flies and mice droppings were seen, as is common in big city restaurants despite professional pest control arrangements being in place, but the observed pest problem did *not* rise to the level of requiring restaurant closure under established board of health standards.

b. Michell's team mentioned the pests to Stephen Monahan, McDonald's Franchise Business Partner, who was more interested in getting the restaurant to reopen.

c. Still, as McDonald's appoints itself the prosecutor, judge, jury, and executioner in interpreting its standards, it disregarded Michell's explanations as repeated here, and added its false and self-serving conclusions about this incident to its "narrative" that Michell has an alleged "lack of candor" history.

91. On or about July 21, 2023, McDonald's placed Coney Island Avenue Store #13068 in an internal cure process even though the refrigeration problem had already been corrected and the restaurant had already reopened with the board of health's permission. Michell overcame this issue despite McDonald's irregularities in applying the cure process.

92. Both the 2022 municipal labor case and the brief 2023 restaurant closure due to the refrigeration failure were fairly common incidents in the McDonald's franchise system and in the operation of quick service restaurants generally. Both incidents were promptly and professionally resolved. Neither detracts one whit from the conclusion that for more than 30 years Michell and his organization have been outstanding, high-quality operators. McDonald's seized on these incidents as pretexts to destroy the Michell Organization one restaurant at a time, as restaurants come up for renewal, or to coerce Michell into selling all his McDonald's restaurants at fire sale prices.

93. McDonald's then denied Michell a full and fair Ombudsman process. Michell invoked this time-honored informal dispute resolution procedure, but instead a newly appointed Ombudsman deferred to the whims of the field office whose abusive conduct gave rise to Michell's grievance.

94. On or about August 25, 2023, McDonald's informed Michell of its final decision to not offer Michell new terms for the four restaurants identified in paragraphs 8 (a) to (c) and the eight (8) non-McDonald's Special Venues at Bradley Airport (that McDonald's was purporting to treat as McDonald's franchises).

**<u>Further Escalation by McDonald's</u>**

95. In February 2024, McDonald's escalated its scheme to drive Michell out of the system by announcing it would not renew the Utica Avenue McDonald's restaurant in Brooklyn (identified in paragraph 8(d)) for the same reasons it had asserted in its August 2023 announcement of its final decision not to renew the four McDonald's restaurants and other licensed restaurants/bars identified in paragraphs 8 (a) to (c). In announcing this decision, McDonald's identified no operational issues, and no breaches of the franchise agreement, regarding the Utica Avenue McDonald's restaurant.

96. McDonald's also asserted in early 2024 that the Stamford Field Office will recommend that two additional Michell restaurants will be denied renewal in 2028; and Chiczewski continues to make it clear to Michell that he will never be renewed at any of his McDonald's locations, and that the Company will continue to hold Larisa Michael's Next Gen career hostage until Michell leaves the system.

97. In early 2024, Roth and Chiczewski also continued in distorting and misrepresenting Michell's communications in their effort to falsely claim he is in continuing

violation of the Owner/Operator Involvement Standard and to otherwise insult and demean Michell.

**False Criticism of Michell Regarding Migrant Workers**

98. In January 2024 Roth falsely accused Michell of announcing (at the "Maximizing Growth" meeting of McDonald's Owner/Operators in Sarasota, Florida on or about January 18, 2024), an alleged plan by Michell to violate state or federal law by hiring migrants who had recently arrived in Florida but who allegedly would not be eligible to work in the United States. However:

99. Contrary to Roth, Michell did *not* advocate the unlawful hiring of migrants or anyone else; and furthermore, Roth knew or should have known that Michell was not advocating the violation of any laws.

100. In advocating the *lawful* hiring of migrants who are eligible to work in the states where Michell's McDonald's restaurants are located, Michell was echoing the welcoming attitude McDonald's has expressed to its Owners/Operators including Michell since 2022 or earlier, as evidenced (without limitation) by emails Michell exchanged with Kenya Handy-Hilliard of McDonald's on October 11, 2022, *after* Handy-Hilliard communicated McDonald's enthusiasm for the "Employment of Migrants" in a Webex meeting that McDonald's had invited the Owner/Operators in Michell's region to participate. These emails are reprinted below:

**From:** Handy-Hilliard Kenya <kenya.handy-hilliard@us.mcd.com>
**Sent:** Tuesday, October 11, 2022 5:08 PM
**To:** Michell George (US Partners) <george.Michell@partners.mcd.com>
**Subject:** RE: Employment of Migrants

Great! Roy Iraci will be your contact in the City. Nellie Thomas is your contact in Yonkers and Julio is your contact in Albany. They will be working out a hiring

day or something of that nature, once we get things straightened out with the Mayor and the Governor.

**Kenya Handy-Hilliard**
Manager, Government Relations I Mobile: +1.929.813.0209

Kenya.Handy-Hilliard@us.mcd.com

---

**From:** Michell George (US Partners) <george.Michell@partners.mcd.com>
**Sent:** Tuesday, October 11, 2022 9:18 AM
**To:** Handy-Hilliard Kenya <kenya.handy-hilliard@us.mcd.com>
**Subject:** Employment of Migrants

Kenya,

Please add us to the list of interested operators. We have stores in Brooklyn, Yonkers and the Albany NY area as well as NJ.

George Michell

**From:** Handy-Hilliard Kenya <kenya.handy-hilliard@us.mcd.com>

**Sent:** Tuesday, October 11, 2022 9:03 AM

**To:**

**REDACTION**[3]

**Subject:** McDonald's Empire/NY Metro Government Relations Update

101. Ignoring McDonald's express policy to welcome the *lawful* hiring of recently arrived migrants, Roth sought to punish Michell for acting consistently with the company's announced policy by falsely accusing Michell of seeking to hire migrants *unlawfully* and to elevate his purposeful or reckless misrepresentation of Michell's words into alleged evidence of Michell's

[3] The names and email addresses of more than 140 persons on the "to" and "cc" lines of Handy-Hilliard's email (including Michell) are redacted for privacy. Each of these persons is believed to be a McDonald's employee or McDonald's Owner/Operator or the employee of an Owner/Operator.

alleged continuing failure to comply with the inherently subjective Owner/Operator Involvement standard, the pretextual basis by which the Defendants including Roth are scheming to steal the equity value of Michell's business from Michell and his family.

102. Roth's targeting of Michell on the issue of migrant hiring was disparate treatment and racially hostile.

**False Criticism of Michell's Retail Pricing**

103. As another example of how McDonald's is straining to insult and demean Michell, Jeff Roth of McDonald's falsely suggested on February 8, 2024, that Michell is deficient in not utilizing industry-standard advisors when setting his retail prices at his McDonald's restaurants on the turnpike in Connecticut; but in fact, Michell uses such advisors.

104. Roth also criticized Michell for allegedly making too much money at his turnpike restaurants but ignored Michell's costs and competitive circumstances.

105. Roth's and McDonald's true purpose was to strong arm Michell into lowering his retail prices at that location, a purpose McDonald's sought to obfuscate as it seeks to maintain the public impression it plays no role in retail pricing decisions by its Owner/Operators.

**McDonald's Attempt to Force Michell Out of Bradley Airport**

106. In early 2024, Michell learned that McDonald's did not intend to reapply for the master concessionaire lease at Bradley Airport which allows Michell (as subtenant) to operate his successful Special Venues.

107. Michell then informed Chiczewski that to protect his substantial business relationships and investments at Bradley Airport, Michell would independently apply to the to the Connecticut Airport Authority for a master concessionaire lease to commence in January 2025, when the present master lease(s) held by McDonald's expires. Michell also informed Chiczewski

he would be willing to sublease to McDonald's for the operation of a continued McDonald's restaurant at the airport (even if McDonald's brought in a different Owner/Operator for the airport location).

108. Michell submitted his application to the Connecticut Airport Authority on April 16, 2024, which was the deadline to apply.

109. Because Michell enjoys good business relationships at Bradley Airport, his proposal makes good sense for McDonald's and for his organization.

110. But on April 20, 2024, Defendant Chiczewski of McDonald's falsely claimed he did not know Michell would be independently applying for the master concessionaire lease; and Chiczewski announced that unless Michell sells all his McDonald's restaurants as Chiczewski has demanded since November 2022, McDonald's will attempt to block Michell from continuing to operate his Special Venues after January 2025 or might seek other relief against Michell if he refuses to abandon his Special Venues.

111. According to Chiczewski, and even though McDonald's is allegedly abandoning its master concessionaire's lease at Bradley Airport, McDonald's would prefer to abandon the opportunity for a continued McDonald's restaurant at Bradley Airport rather than acquiesce in Michell obtaining the master lease as a means of preserving his profitable Special Venues.

112. In threatening to pull the McDonald's brand out of Bradley Airport, as a means of punishing or leveraging Michell, McDonald's appears to be acting contrary to its own business interests. However, the windfall McDonald's would wrongfully reap if it were to succeed in forcing Michell to sell his McDonald's restaurants at fire sale prices, as McDonald's demands, would offset (and likely exceed) McDonald's lost income in abandoning the airport. McDonald's intends to profit from its wrongful scheme against Michell alleged in this Complaint.

## **Through the Date of this Complaint**

113. Through the date of this Complaint:

a. Faced with McDonald's escalation, Michell explored the possibility of resolution without litigation, but his efforts to remain in the McDonald's franchise system are being rebuffed.

b. McDonald's continued to assert false narratives at every chance possible to bolster its claim that Michell did not meet the Owner/Operator Involvement standard, while refusing to define a path for Michell to cure his alleged failure to meet the subjective Owner/Operator Involvement Standard.

c. McDonald's repeatedly ignored Michell's efforts to communicate and work professionally with McDonald's to address any of its alleged concerns.

d. McDonald's refused to define a path for Michell to cure his alleged violations of the Owner/Operator Involvement Standard.

e. McDonald's further punished Michell by refusing to give him a list of McDonald's approved Owner/Operators whom the Company might approve as potential buyers, thus preventing Michell from trying to sell any of his stores on his own hoping to obtain fair market value.

f. McDonald's refused to rescind its bad faith, discriminatory decision to punish or leverage Michell by removing his daughter, Larisa Michell, from the Company's Next Generation Program.

114. Michell has notice from other owner/operators that McDonald's campaign against Michell is well-known among McDonald's Owner/Operators. This means there is no fair market

to sell his McDonald's restaurants even if he wanted to sell as McDonald's has intentionally created a fire-sale atmosphere.

115. Before this case, Michell had no grievances with McDonald's that rose to the level of attempted resolution through the Ombudsman program; and he had no litigation with McDonald's. He has been an exemplary Owner/Operator since 1990 who has been betrayed by an arrogantly abusive and discriminatory franchisor that believes it can steal the equity value of his McDonald's restaurants (and other licensed venues) without consequences.

## COUNT I
## VIOLATIONS OF THE CONNECTICUT FRANCHISE ACT

116. Plaintiffs Michell, Michell.Bradley and Berlin Foods incorporate paragraphs 1 through 115 as though set forth herein in Count I against McDonald's Corporation and McDonald's USA.

117. The Connecticut Franchise Act provides in Section 42-133f (entitled "Termination, or cancellation of, or failure to renew a franchise") that:

> (a) No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause shown which shall include but not be limited to franchisee's default or failure to comply substantially with any material and reasonable obligation of the franchise agreement …

Conn. Gen. Stat. Ann. § 42-133f (West).

118. McDonald's Store #28784 owned and operated by Plaintiffs Michell and Michell.Bradley at Bradley Airport in Windsor Locks, Connecticut is a franchise protected by the Connecticut Franchise Act.

119. McDonald’s Store #148 owned and operated by Plaintiffs Michell and Berlin Foods on Berlin Turnpike in Newington, Connecticut is a franchise protected by the Connecticut Franchise Act.

120. McDonald’s has violated the cited provisions of the Connecticut Franchise Act by announcing the non-renewal of McDonald’s Stores #28784 and #148 without good cause.

121. The Connecticut Franchise Act further provides in Section 42-133g (entitled “Actions for Violation”) that:

> (a) Any franchisee may bring an action for violation of sections 42-133e to 42-133g, inclusive, in the Superior Court to recover damages sustained by reason of such violation, which action shall be privileged in respect to its assignment for trial and, where appropriate, may apply for injunctive relief as provided in chapter 916. Such franchisee, if successful, shall be entitled to costs, including, but not limited to, reasonable attorneys' fees.

Conn. Gen. Stat. Ann. § 42-133g (West).

122. Plaintiffs Michell, Michell.Bradley and Berlin Foods have been substantially injured and damaged and will suffer additional damages if McDonald’s violations of the Connecticut Franchise Act are not redressed.

123. Without limitation, the Plaintiffs’ damages may include lost profits and/or injury to business value and loss of equity and consequential damages that are not yet determined.

124. Without limitation, Plaintiffs’ consequential damages include the injury to business value and loss of equity in their Bradley Airport Special Venues, as these losses are not *merely* foreseeable to McDonald’s as the consequence of McDonald’s violations of the Connecticut Franchise Act. McDonald’s *intends* for Michell and Michell.Bradley to suffer these consequential

damages if Michell fails to wave the white flag of surrender and allow McDonald's to escape liability for its violations of the Connecticut Franchise Act alleged in this Complaint.

125. The extent of injury and actual and consequential damages will be proven at trial.

126. In addition:

a. The conduct of McDonald's violating the Connecticut Franchise Act creates an actual and justiciable controversy between the parties.

b. To avoid irreparable injury, Plaintiffs Michell and Michell.Bradley pray in equity for declaratory judgment under 28 U.S.C. §2201 that McDonald's conduct violates or threatens to violate the Connecticut Franchise Act by not-renewing McDonald's Stores #28784 and #148 or purposefully causing any circumstances that would prevent these renewals from occurring.

c. Justice requires Declaratory Judgment against McDonald's.

d. The balance of equities favor Plaintiffs Michell, Michell.Bradley and Berlin Foods.

127. In addition:

a. The conduct of McDonald's constituting violations of the Connecticut Franchise Act threatens irreparable injury to Plaintiffs Michell, Michell.Bradley and Berlin Foods.

b. To avoid irreparable injury, Plaintiffs Michell, Michell.Bradley and Berlin Foods pray in equity that McDonald's, and all persons acting in concert with these corporate Defendants, be enjoined from continuing and carrying out their announced intent to violate Connecticut Franchise Act by not-renewing McDonald's Stores #28784 and #148 or purposefully causing any circumstances that would prevent these renewals from occurring.

c. Justice requires injunctive relief against McDonald's.

d. The balance of equities favors Plaintiffs Michell, Michell.Bradley and Berlin Foods.

128. Because McDonald's violations of the Connecticut Franchise Act are willful and malicious, the Court should award punitive or exemplary damages against McDonald's in an amount sufficient to punish this franchisor, one of the world's largest, and deter others from like misconduct.

129. Plaintiffs reserve their election of remedies.

**COUNT II**
**BREACHES AND ANTICIPATORY BREACHES OF FRANCHISE AGREEMENTS**

130. All Plaintiffs incorporate paragraphs 1 through 129 as though set forth herein against McDonald's Corporation and McDonald's USA.

131. Each Plaintiff is party to one or more enforceable franchise agreements with McDonald's USA for the operation of McDonald's restaurants alleged in paragraph 8.

132. Each Plaintiff has performed or substantially performed their obligations under all of their respective franchise agreements with McDonald's for each McDonald's restaurant.

133. Each Plaintiff has the right to demand substantial performance from McDonald's under all of their respective agreements with McDonald's for each McDonald's restaurant.

134. In Section 27 of Michell's franchise agreements, McDonald's provides, and Michell agrees, that the franchise agreement is governed by the law of Illinois, where McDonald's is headquartered.

135. In Section 28 of Michell's franchise agreements, McDonald's creates the prospect of franchise renewal on the expiration the current franchise terms. McDonald's then established a

course of dealing whereby Owner/Operators obtain franchise renewals by complying with McDonald's National Franchising Standards.

136. Under applicable Illinois law, the parties to McDonald's franchise agreements (both franchisor and franchisee) owe reciprocal duties of good faith and fair dealing to each other. As a matter of law, the implied covenant of good faith and fair dealing requires (without limitation) that the parties act with proper motive, and do not act arbitrarily or capriciously or in ways inconsistent with their mutual expectations in entering into the franchise relationship.

137. As a matter of law, McDonald's must act with good faith and fair dealing under its existing franchise agreements in granting franchise renewals expressly contemplated in paragraph 28 of each franchise agreement.

138. After it announced its BBV 2020 Plan and other measures that intentionally imposed substantially higher costs on its Owner/Operators, McDonald's breached its implied covenant of good faith and dealing to Michell and to its other Owner/Operators when it promulgated its current National Franchising Standards including but not limited to the Owner/Operator Involvement Standard.

139. By McDonald's intent and design, the current Owner/Operator Involvement Standard purports to empower McDonald's to be arbitrary, capricious, unfair, unreasonable, inconsistent, discriminatory, and/or retaliatory in unilaterally deciding whether an Owner/ Operator is complying with this subjective standard and in giving itself the unilateral power to punish Owner/Operators that fall into disfavor, for example but without limitation, if they communicate facts or express opinions McDonald's disagrees with.

140. McDonald's adoption of its current Owner/Operator Involvement Standard constitutes a breach by McDonald's of its implied covenant of good faith and fair dealing by its

mere existence as it creates the inherent potential for abuse by McDonald's and wrongfully empowers McDonald's to act arbitrarily, capriciously, unfairly, unreasonably, inconsistently, discriminatorily, and in retaliatory ways towards its Owner/Operators.

141. The subjectivity of the current Owner/Operator Involvement Standard, and hence its inherent potential for abuse by McDonald's, is far beyond the reasonable expectation of Michell, or other McDonald's Owner/Operators who joined the system in earlier years before the new standards were announced.

142. The subjectivity of the current Owner/Operator Involvement Standard, and hence its inherent potential for abuse by McDonald's, contradicts McDonald's established course of dealing with its Owner/Operators, who reasonably expect McDonald's to be objective in deciding when Owner/Operators meet the standards that determine if the Owner/Operator will be eligible for expansion and renewal (rewrite/new terms).

143. In addition, McDonald's has breached its implied covenant of good faith and fair dealing to Michell and his companies by announcing, for arbitrary, capricious, discriminatory, and retaliatory reasons, not grounded in objective facts, that Michell did not comply with the current Owner/Operator Involvement Standard, and further announcing, on that basis, that McDonald's will not renew the franchise agreements alleged in paragraph 8. This decision by McDonald's is arbitrary and capricious, retaliatory, discriminatory, made in bad faith, lacks proper motive, and is far beyond the contracting parties' reasonable expectations.

144. In addition, McDonald's has breached its implied covenant of good faith and fair dealing to Michell and his companies by announcing that Michell cannot cure his alleged violations of the current Owner/Operator Involvement Standard. This decision by McDonald's is

arbitrary and capricious, unfair, unreasonable, retaliatory, discriminatory, made in bad faith, lacks proper motive, and is far beyond the contracting parties' reasonable expectations.

145. In addition, McDonald's has breached and/or anticipatorily breached its implied covenant of good faith and fair dealing to Michell by threatening that Michell's remaining franchise agreements will not be renewed as their terms subsequently expire in future years. These threats by McDonald's are arbitrary and capricious, unfair, unreasonable, retaliatory, discriminatory, made in bad faith, and lack proper motive.

146. In addition, McDonald's has breached its implied covenant of good faith and fair dealing to Michell and his companies by demanding that he sell all of his franchised McDonald's restaurants before their franchise terms expire. This decision by McDonald's is arbitrary and capricious, unfair, unreasonable, retaliatory, discriminatory, made in bad faith, lacks proper motive, and is far beyond the contracting parties' reasonable expectations.

147. In addition, McDonald's has breached its implied covenant of good faith and fair dealing to Michell by demanding that he sell all of his franchised McDonald's restaurants at fire-sale prices. This breach extends to McDonald's discretionary power to approve or deny approval of sales of its franchised restaurants by an Owner/Operator to another Owner/Operator, as established in Section 15 of the McDonald's franchise agreements; in addition to its discretionary authority on whether to grant rewrite. This decision by McDonald's is arbitrary and capricious, unfair, unreasonable, retaliatory, discriminatory, made in bad faith, lacks proper motive, and is far beyond the contracting parties' reasonable expectations.

148. In addition, McDonald's has breached its implied covenant of good faith and fair dealing to Michell by holding his daughter's career as a qualified Next Gen Owner/Operator hostage to its wrongful scheme to drive Michell out of the system for less than the fair value of his

McDonald's restaurants. This decision by McDonald's is arbitrary and capricious, unfair, unreasonable, retaliatory, discriminatory, made in bad faith, lacks proper motive, and is far beyond the contracting parties' reasonable expectations.

149. In addition, McDonald's has breached and/or anticipatorily breached its implied covenant of good faith and fair dealing to Michell by seeking to remove him from the eight non-McDonald's restaurants that McDonald's controls at Bradley Airport unless he agrees to sell his McDonald's restaurants for than fair value. This decision by McDonald's is arbitrary and capricious, unfair, unreasonable, retaliatory, discriminatory, made in bad faith, lacks proper motive, and is far beyond the contracting parties' reasonable expectations.

150. As the direct and proximate result of McDonald's breaches and anticipatory breaches of contract as alleged herein, Michell and his companies have been substantially injured and damaged and will suffer additional damages if McDonald's breaches and anticipatory breaches are not redressed.

151. Without limitation, Plaintiffs' actual and consequential damages may include lost profits and/or injury to business value and loss of equity in their McDonald's restaurant franchises.

152. Without limitation, Plaintiffs' consequential damages may include the injury to business value and loss of equity in their Bradley Airport Special Venues, as these losses are not *merely* foreseeable as the consequence of McDonald's breaches of its franchise agreements. McDonald's *intends* for Michell to suffer these consequential damages if Michell fails to wave the white flag of surrender and allow McDonald's to escape liability for its breaches of contract alleged in this Complaint.

153. The extent of injury and damages are not yet determined and will be proven at trial.

154. In addition:

a. The conduct of McDonald's USA constituting actual and anticipatory breaches of contract, as alleged above, creates an actual and justiciable controversy between the parties.

b. To avoid irreparable injury, Plaintiffs pray in equity for declaratory judgment under 28 U.S.C. §2201 that McDonald's USA has breached its franchise agreements with Plaintiffs in one or more ways alleged in this Count II.

c. Justice requires Declaratory Judgment against McDonald's USA.

d. Plaintiffs lack an adequate remedy at law.

155. In addition:

a. The conduct of McDonald's USA constituting actual and anticipatory breaches of contract, as alleged above, threatens irreparable injury to Plaintiffs.

b. To avoid irreparable injury, Plaintiffs pray in equity that McDonald's USA, and all persons acting in concert with this Defendant, be enjoined from continuing and carrying out the breaches of its franchise agreements with Plaintiffs in one or more ways alleged in this Count II.

c. Justice requires injunctive relief against McDonald's USA and all persons acting in concert with this Defendant.

d. Plaintiffs lack an adequate remedy at law.

156. Plaintiffs reserve their election of remedies.

## COUNT III

## PROMISSORY ESTOPPEL

## (Pled in the Alternative to Count II)

157. In the alternative to Count II for breaches and anticipatory breaches of contract, all Plaintiffs incorporate paragraphs 1 through 156 as though set forth herein in this Count III against McDonald's Corporation and McDonald's USA.

158. McDonald's expressly and impliedly promised Michell he could obtain renewal franchise agreements if he met the requirements for renewal established by the Company. These conditional promises were made in the franchise agreements, the company's policies communicated to the Owner/Operators, and the parties' course of dealing.

159. In promising franchise renewals to Michell if he complied with the Company's National Franchising Standards and other requirements, McDonald's induced Michell's full and faithful performance over the full 20-year terms of his franchise agreements, without slacking off as expirations approach; and McDonald's further induced Michell to reinvest in his franchise restaurants in the reasonable belief he would recoup his investments after his franchises are renewed.

160. Michell relied on McDonald's promises of renewal by faithfully performing under his existing franchise agreements and, after BBV 2020, in reinvesting more than $20 million into his franchised McDonald's restaurants in the reasonable belief he would recoup his investments after his franchises are renewed.

161. As late as April 2022, McDonald's expressly affirmed that Michell was eligible for franchise renewals.

162. Michell continued to rely on McDonald's express and implied promises of franchise renewal after April 2022.

163. Michell fulfilled or substantially fulfilled the conditions stated by McDonald's as conditions to franchise renewals.

164. Because Michell detrimentally relied on McDonald's conditional promises of franchise renewal, and because Michell fulfilled the conditions stated by McDonald's, McDonald's is estopped from withdrawing its promises of franchise renewals.

165. McDonald's conduct beginning at the November 29, 2022, meeting alleged herein and continuing through the date of this Complaint constitutes a wrongful attempt by McDonald's to withdraw the promises of franchise renewals on which Michell reasonably and justifiably relied.

166. Justice requires the enforcement of McDonald's promises of franchise renewals.

167. As the direct and proximate result of McDonald's wrongful repudiation of its promises of franchise renewals, Michell and his companies have been substantially injured and damaged and will suffer additional damages if McDonald's breaches and anticipatory breaches are not redressed.

168. Without limitation, Plaintiffs' actual and consequential damages may include lost profits and/or injury to business value and loss of equity in their McDonald's restaurant franchises.

169. Without limitation, Plaintiffs' consequential damages may include the injury to business value and loss of equity in their Bradley Airport Special Venues, as these losses are not *merely* foreseeable as the consequence of McDonald's repudiation of its promises. McDonald's *intends* for Michell to suffer these consequential damages if Michell fails to wave the white flag of surrender and allow McDonald's to escape liability for its repudiation of its promises on which Michell justifiably relied.

170. The extent of injury and damages are not yet determined and will be proven at trial.

171. In addition:

a. The conduct of McDonald's USA constituting actual and anticipatory repudiation of its promises, as alleged above, creates an actual and justiciable controversy between the parties.

b. To avoid irreparable injury, Plaintiffs pray in equity for declaratory judgment under 28 U.S.C. §2201 that McDonald's USA has wrongfully repudiated its promises to Plaintiffs in one or more ways alleged in this Count III.

c. Justice requires Declaratory Judgment against McDonald's USA.

d. Plaintiffs lack an adequate remedy at law.

172. In addition:

a. The conduct of McDonald's USA constituting actual and anticipatory repudiation of its promises, as alleged above, threatens irreparable injury to Plaintiffs.

b. To avoid irreparable injury, Plaintiffs pray in equity that McDonald's USA, and all persons acting in concert with this Defendant, be enjoined from continuing and carrying out the repudiation of its promises, as alleged above in this Count III.

c. Justice requires injunctive relief against McDonald's USA and all persons acting in concert with this Defendant.

d. Plaintiffs lack an adequate remedy at law.

173. Plaintiffs reserve their election of remedies.

## COUNT IV

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AT SPECIAL VENUE LOCATIONS

174. Plaintiffs Michell and Bradley.Michell incorporate paragraphs 1 through 173 as though set forth herein in this Count IV against McDonald's Corporation and McDonald's USA.

175. For reasons previously alleged, Plaintiffs Michell and Michell.Bradley have valuable business relationships in their Special Venues at Bradley Airport and the reasonable probability these profitable businesses would continue and expand but for McDonald's attempt to drive Michell out of Bradley Airport in addition to driving him out of the McDonald's restaurant franchise system.

176. To bolster its control over the Bradley Airport Special Venues, McDonald's assigns McDonald's store numbers to them and pretends they are McDonald's "franchises", but that contention is erroneous as a matter of law. The Special Venues are not McDonald's franchises under the Federal Trade Commission Franchise Rule, 16 CFR Part 436.1 et seq. or under Connecticut law. These Special Venues are dissimilar to McDonald's restaurants and McDonald's does not own any of the special venue trademarks and has no control over any aspect of these restaurants and bars.

177. To the contrary, Michell has franchise or licensing agreements for seven special venues with the respective third parties that developed these concepts, whereby these Plaintiffs are licensed to use the respective trademarks and concepts at Bradley Airport including:

1) Fresh City (McDonald's Store #30494).
2) Papa Gino's Pizza (McDonald's Store #30495).
3) D'Angelos (McDonald's Store #35503).
4) Black Bear Saloon (McDonald's Store #34394).
5) Cask & Barrel Bistro (McDonald's Store #34514).
6) Phillips Seafood Restaurant (McDonald's Store #35028).
7) Two Roads Taproom (McDonald's Store #30497).

178. Michell owns the trademark for the eighth Special Venue ("Traveltini"), a concept that Michell developed and implemented at Bradley Airport.

179. Michell has good business relationships with the franchisors for the first seven Special Venues and has good business relationships with the Connecticut Airport Authority's

managers and employees at Bradley Airport, where Michell's teams interact with airport managers and employees every day.

180. Michell has continued to invest in his Special Venues at Bradley Airport and plans to expand, adding another venue, if he is able to secure a new lease or sublease.

181. The facts alleged in paragraphs 175-180 are known to McDonald's.

182. As alleged above, and as part of its scheme to drive Michell out of the McDonald's franchise system, McDonald's has announced it will refuse to renew Michell's alleged "franchises" and related subleases for the Bradley Airport Special Venues unless Michell agrees to sell all of his McDonald's restaurants at the fire sale prices that McDonald's is demanding. McDonald's also opposes Michell's attempt to obtain leases for his Special Venues directly with the Connecticut Airport Authority even it means McDonald's will lose its branded restaurant presence, and Special Venue revenue, at this airport. This conduct by McDonald's is a bad faith, punitive measure intended to increase the pressure on Michell to succumb to McDonald's wrongful demands that he sells all of his McDonald's restaurants at fire sale prices.

183. Michell has substantially performed all his obligations as sublessee at the airport and is operating these Special Venues profitably and successfully. McDonald's has no business reasons related to the Special Venues themselves to be taking this punitive stance toward Michell at Bradley Airport.

184. In attempting to drive Michell out of his Special Venues at Bradley Airport, and threatening to take (baseless) retaliatory actions under Michell's franchise agreements if Michell is awarded new leases for these Special Venues, McDonald's is committing the common law tort of tortious interference with business expectancies because:

a. Michell and Michell Bradley have actual and prospective business relationships at Bradley Airport, and have invested great time, money, and effort developing these relationships.

b. McDonald's knows of Michell and Michell.Bradley's actual and prospective business relationships at Bradley Airport and is intentionally interfering by not renewing Plaintiffs' subleases and/or attempting to block these Plaintiffs from proceeding on their own to maintain the *status quo* by obtaining the master concessionaire lease.

c. McDonald's conduct intentionally threatens these Plaintiffs with substantial and foreseeable economic losses; and

d. McDonald's has no business justification for its actions and is maliciously seeking to intimidate and punish Michell.

185. As the direct and proximate result of McDonald's intentional tort alleged herein, Michell and Michell.Bradley have been substantially injured and damaged and will suffer additional damages if McDonald's tortious conduct is not redressed.

186. Without limitation, Plaintiffs' damages may include lost profits and/or injury to business value and loss of equity and consequential damages that are not yet determined. The extent of injury and damages will be proven at trial.

187. In addition:

a. The conduct of McDonald's USA constituting tortious interference threatens irreparable injury to Plaintiffs Michell and Michell.Bradley.

b. To avoid irreparable injury, Plaintiffs Michell and Michell.Bradley pray in equity that McDonald's USA, and all persons acting in concert with this Defendant, be

enjoined from continuing and carrying out their tortious interference as alleged in this Count IV.

c. Justice requires injunctive relief against McDonald's USA and all persons acting in concert with this Defendant.

d. Plaintiffs lack an adequate remedy at law.

188. Because McDonald's tortious interference is willful and malicious, the Court should award punitive or exemplary damages against McDonald's in an amount sufficient to punish this franchisor, one of the world's largest, and deter others from like misconduct.

189. Plaintiffs reserve their election of remedies.

## **COUNT V**

## **COMMON LAW FRAUD**

190. All Plaintiffs incorporate paragraphs 1 through 189 as though set forth herein in this Count V against McDonald's Corporation and McDonald's USA.

191. As alleged above, McDonald's incentivizes its Owner/Operators to work towards achieving "new terms" (previously called "rewrites") upon the expiration of an existing franchise term. This is done through express franchise agreement language holding open the new term possibility, and by the publication of system policies such as the "New Term Policy" and through the long-established course of dealing.

192. McDonald's derives substantial benefit by encouraging its Owner/Operators to strive for rewrite. Without limitation, McDonald's benefits when its Owner/Operators continue to reinvest in their restaurants to meet evolving system standards and deliver first rate operational performance through the end of their franchise terms.

193. When McDonald's announced BBV 2020 and similar programs since 2018, McDonald's knew it was imposing higher costs on its Owner/Operators. McDonald's continued to dangle the possibilities of expansion and new terms as incentives for its Owner/Operators to meet the new reinvestment requirements.

194. As alleged, since 2018, Michell and his various operating companies spent over $20 million in improvements to 36 of their franchised McDonald's restaurants to meet new requirements announced by McDonald's.

195. Michell expended more than $20 million at his McDonald's restaurants and additional sums at his Bradley Airport in reliance on McDonald's continuing representation that he and other Owner/Operators would be renewed if they complied with McDonald's requirements for renewal as those requirements existed when Michell committed the funds for the reinvestments McDonald's was demanding.

196. At all times since 2018, McDonald's knew it was purposefully inducing Michell to rely on the longstanding course of dealing that Owner/Operators that comply with McDonald's established standards are rewarded with new franchise terms enabling them to recoup their continuing reinvestments.

197. In announcing BBV 2020 and subsequent new required expenditures since 2018, McDonald's intentionally reinforced Michell's belief that Owner/Operators that meet the new and unprecedented reinvestment requirements and comply with McDonald's established standards will be rewarded with new franchise terms enabling them to recoup their continuing reinvestments.

198. Michell would not have spent over $20 million to improve his restaurants as McDonald's demanded and (additional sums at the Special Venues) unless he reasonably believed he would obtain a reasonable return on these expenditures.

199. Michell would not have spent over $20 million to improve his restaurants (additional sums at the Special Venues) if he knew McDonald's would target him for elimination from the system at fire sale prices.

200. Having purposefully induced Michell and all or most other Owner/Operators in the United States to reinvest at unprecedented levels in the belief McDonald's would honor the established course of dealing in granting new franchise terms to those franchisees who complied with the reinvestment demands and also complied with McDonald's established standards on granting new franchise terms.

201. McDonald's changes to its New Term policy announced in June 2022 and in its National Franchising Standards effective January 1, 2023, and in the manner, McDonald's applies these revised policies and standards, were material changes.

202. On information and belief, McDonald's intended for a period of time before June 2022, presently unknown to Michell (to be determined in discovery), to change its New Term policy and National Franchising Standards, and thereby repudiate the course of dealing on which McDonald's had induced its Owner/Operators to rely.

203. From the moment McDonald's decided to change its New Term policy and National Franchising Standards, McDonald's had the duty to disclose this intent to its Owner/Operators that, as McDonald's knew, were relying on the course of dealing that McDonald's knew it would repudiate.

204. McDonald's committed fraud by omission that is actionable at common law in failing to disclose its intent to change its New Term policy and National Franchising Standards in the ways alleged in this Complaint while allowing its Owner/Operators to continue to rely on the prior course of dealing.

205. McDonald's committed fraud by omission that is actionable at common law in failing to disclose its intent to use its revised New Term policy and National Franchising Standards to target Owner/Operators such as Michell for elimination from the McDonald's franchise system in ways that would not have occurred under the prior standards that were part of the course of dealing that Michell relied on.

206. McDonald's committed fraud by omission with intent to deceive or with reckless disregard for the truth.

207. As part of their scheme to defraud Michell and expel him from the franchise system, McDonald's has made false allegations against Michell, as above alleged in this Complaint, to manufacture phony grounds to declare Michell and his organization ineligible for new franchise terms.

208. McDonald's made false allegations against Michell, as above alleged in this Complaint, with knowledge of falsity or with reckless disregard for the truth.

209. As the direct, intended, and proximate result of McDonald's fraud, Michell and his companies have been substantially injured and damaged and will suffer additional damages if McDonald's fraud is not redressed.

210. Without limitation, the Plaintiffs' damages may include lost profits and/or injury to business value and loss of equity and consequential damages pertaining to his McDonald's restaurants and Bradley Airport Special Venues that are not yet determined but will be proven at trial.

211. Defendants' intentional fraud against Michell warrants the imposition of punitive damages in an amount sufficient to punish these Defendants and deter others from like misconduct.

## COUNT VI

## DEPRIVATION OF CIVIL RIGHTS BY ALL DEFENDANTS

### Disparate Treatment

212. All Plaintiffs incorporate paragraphs 1 through 211 as though set forth herein in this Count VI against all Defendants.

213. Michell and his named company plaintiffs sue under Section 1981 of the Civil Rights Act of 1870, 42 U.S.C. §1981 ("Section 1981"), which provides:

**a) Statement of equal rights:**

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**b) "Make and enforce contracts" defined**

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**c) Protection against impairment**

> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

214. As a matter of law under Section 1981:

a. McDonald's franchise agreements and related contracts with its franchisees are "contracts" creating "contractual relationships."

b. Michell is a natural person of Hispanic heritage distinct from "white citizens" as that term is used in Section 1981.

c. Section 1981 grants Michell the same legal rights as "white citizens" to make and enforce franchise agreements and other contracts with McDonald's, including the

making, performance, modification, and termination of franchise agreements and other contracts, and the enjoyment of all benefits, privileges, terms, and conditions of their franchise relationship with McDonald's.

d. The corporate plaintiffs are "persons" owned by non-white citizens that derivatively enjoy the same legal right as corporations owned or controlled by white citizens or white citizens themselves, to the making, performance, modification, and termination of franchise agreements and other contracts with McDonald's, and the enjoyment of all benefits, privileges, terms, and conditions of its franchise relationship with McDonald's; and

e. McDonald's is prohibited from engaging in non-governmental discrimination against non-white citizens such as Michell and his operating companies.

f. Obtaining "rewrite" of a franchise agreement or a "new term" upon the expiration of a franchise term is to "make" a contract within the meaning of Section 1981(a) and (b).

g. Obtaining "rewrite" of a franchise agreement or a "new term" upon the expiration of a franchise term under the parties' established course of dealing is part of "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" within the meaning of Section 1981(b).

h. Being treated by McDonald's and its officers, employees and agents with honesty, integrity. and respect is part of "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" within the meaning of Section 1981(b).

i. Being treated by McDonald's and its officers, employees and agents with good faith and fair dealing, in ways not arbitrary, not capricious, not unfair, not unreasonable,

not inconsistent, and not beyond the scope of the contracting parties' reasonable expectations is part of "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" within the meaning of Section 1981(b).

215. Without limitation, McDonald's and the individual Defendants are required by Section 1981 to treat Michell and his companies the same as white Owner/Operators are treated in all the ways described in paragraph 214 (f), (g), (h), and (i).

216. Without limitation, McDonald's and the individual Defendants are engaged in a continuing violation of Section 1981 by intentionally failing to treat Michell and his companies the same as white Owner/Operators are treated in all the ways described in paragraph 214 (f), (g), (h), and (i).

217. In falsely and retroactively claiming Michell fails to meet National Franchising Standards, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

218. In seeking to punish Michell for occurrences that white franchisees have not been punished for, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

219. In seeking to usurp the equity value of Michell's franchised McDonald's restaurants based on false accusations and phony conclusions, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

220. In holding his daughter Larisa Michell's career as a Next Gen owner hostage as leverage in their scheme to steal the value of his businesses, McDonald's and the individual

Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

221. In threatening to inflict business losses on Michell and on *themselves* by opposing Michell's effort to protect and continue his valuable established business relationships at Bradley Airport, as leverage in their scheme to steal the value of his businesses, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

222. In accusing Michell of seeking to entice recent migrants largely of Hispanic heritage to come "north" from Florida then hire them in alleged violation of law, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

223. In insulting Michell by falsely accusing him of acting unreasonably in setting retail prices and failing to consult advisors, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

224. In trying to strong-arm Michell on retail pricing and accusing him of trying to make too much money, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

225. In depriving Michell of a full and fair Ombudsman process including appeal, McDonald's and the individual Defendants violated Section 1981 by engaging in disparate treatment of Michell and his companies because of race.

226. McDonald's empowers field officers such as Chiczewski, Roth, and Cronan to represent the Company in its relationship with its Owner/Operators and empowers these field

officers to exercise the Company's broad discretion under its franchise agreements and its franchising policies, and in applying the National Franchising Standards.

227. Beginning on a date unknown to Michell, McDonald's, acting through individual defendants Chiczewski, Roth, and Cronan, discriminatorily targeted Michell for expulsion from the McDonald's franchise system with the intent of causing Michell and his companies to lose substantial equity in their successful McDonald's restaurants and non-McDonald's Bradley Airport venues.

228. As part of their discriminatory scheme, McDonald's, acting through individual defendants Chiczewski, Roth, and Cronan, applied their written and *de facto* system-wide policies, standards, protocols, and programs against Michell in arbitrary, capricious, dishonest, and discriminatory ways that are not equivalently applied to White Owner/Operators.

229. As part of their discriminatory scheme, McDonald's, acting through individual defendants Chiczewski, Roth, and Cronan, engaged in lying, deception, and fraud against Michell.

230. As part of their discriminatory scheme, McDonald's, acting through individual defendants Chiczewski, Roth, and Cronan , harassed and defamed Michell and subjected him to a hostile environment.

231. McDonald's intentionally discriminated against Michell and his companies based on race under *respondeat superior* and in failing to correct the blatant discrimination of these officers after it had notice of their misconduct.

232. Prior to the events in this case, Michell was an exceptional McDonald's Owner/Operator in performance and achievement.

233. Prior to the events in this case, Michell did nothing to incur the wrath and animosity of McDonald's or the individual Defendants.

234. Michell and his organization have been, as good or better Owner/Operators than the white franchisees that received substantially better treatment by McDonald's. They deserved none of the adverse treatment inflicted on them by McDonald's and the individual Defendants.

235. As the direct and proximate result of McDonald's and the Individual Defendants violations of Section 1981, Michell and the corporate plaintiffs have and will continue to suffer substantial economic damages in amounts that will be proven at trial, and which include the loss of past, present, and future profits, and income and/or lost equity value in McDonald's franchises in amounts to be proven at trial.

236. As the direct and proximate result of McDonald's and the individual Defendants violations of Section 1981, Michell has personally suffered intangible injury resulting from the deprivation of his civil rights.

237. As the direct and proximate result of McDonald's and the Individual Defendants violations of Section 1981, Michell has suffered emotional and physical suffering and distress, humiliation, damage to professional reputations and to future business prospects.

238. The discriminatory conduct of McDonald's and the individual Defendants was intentional and malicious, making punitive or exemplary damages necessary to punish these Defendants and to deter others from like misconduct.

## COUNT VII

## DEPRIVATION OF CIVIL RIGHTS BY ALL DEFENDANTS

### Retaliation

239. All Plaintiffs incorporate paragraphs 1 through 238 as though set forth herein in this Count VII against all Defendants.

240. As alleged in paragraph 84 of this Complaint, and on other occasions, Michell put Defendants on notice of his reasonable belief he was being subjected to unlawful disparate treatment in connection with the New York City municipal labor law case.

241. After Michell put Defendants on notice of his claim of disparate treatment, Defendants failed to investigate and/or failed to offer Michell any explanation of the alleged disparate treatment or any assurances there would be no disparate treatment going forward.

242. Instead, Defendants escalated their campaign to harass and demean Michell and to drive him out of the franchise system in all the wrongful and discriminatory ways alleged in this Complaint.

243. Defendants' conduct after Michell complained about disparate treatment was unlawful retaliation that independently violates Section 1981.

244. As the direct and proximate result of McDonald's and the Individual Defendants retaliatory violations of Section 1981, Michell and the corporate plaintiffs have and will continue to suffer substantial economic damages in amounts that will be proven at trial, and which include the loss of past, present, and future profits and income and/or lost equity value in McDonald's franchises in amounts to be proven at trial.

245. As the direct and proximate result of McDonald's and the individual Defendants retaliatory violations of Section 1981, Michell has personally suffered intangible injury resulting from the deprivation of his civil rights.

246. As the direct and proximate result of McDonald's and the Individual Defendants retaliatory violations of Section 1981, Michell has suffered emotional and physical suffering and distress, humiliation, damage to professional reputations and to future business prospects.

247. The retaliatory conduct of McDonald's and the individual Defendants was intentional and malicious, making punitive or exemplary damages necessary to punish these Defendants and to deter others from like misconduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request judgment against Defendants on Counts I through VII as follows:

I. On Count I under the Connecticut Franchise Act, Plaintiffs Michell, Michell.Bradley and Berlin Foods request the entry of judgment against McDonald's Corporation and McDonald's USA, LLC for:

A. Actual damages to be proven at trial.
B. Consequential damaged to be proven at trial.
C. Punitive damages to the extent available under law.
D. Declaratory judgment that McDonald's conduct violates or threatens to violate the Connecticut Franchise Act by not-renewing McDonald's Stores #28784 and #148 or purposefully causing any circumstances that would prevent these renewals from occurring.
E. The entry of an injunction under the Connecticut Franchise Act against McDonald's (and all persons acting in concert with these corporate Defendants) to prevent them from continuing and carrying out their announced intent to violate Connecticut Franchise Act by not-renewing McDonald's Stores #28784 and #148 or purposefully causing any circumstances that would prevent these renewals from occurring.

II. On Count II for Breaches and Anticipatory Breaches of Franchise Agreements, All Plaintiffs request the entry of judgment against McDonald's Corporation and McDonald's USA, LLC for:

A. Actual damages to be proven at trial.

B. Consequential damaged to be proven at trial.

C. Declaratory Judgment that McDonald's has breached its franchise agreements with Plaintiffs in one or more ways alleged in Count II.

D. Injunctive relief against McDonald's USA (and all persons acting in concert with this Defendant) to enjoin them from committing the breaches of contract alleged in Count II.

III. In the alternative to Count II, on Count III for Promissory Estoppel, all Plaintiffs request the entry of judgment against McDonald's Corporation and McDonald's USA, LLC for:

A. Actual damages to be proven at trial.

B. Consequential damaged to be proven at trial.

C. Declaratory Judgment that McDonald's must be estopped from repudiating its promises of franchise renewal as alleged in Count III.

D. Injunctive relief against McDonald's USA (and all persons acting in concert with this Defendant) to estop them from repudiating their promises of franchise renewal as alleged in Count III.

IV. On Count IV for tortious interference, Plaintiffs Michell and Michell.Bradley request the entry of judgment against McDonald's Corporation and McDonald's USA for:

A. Actual damages to be proven at trial.

B. Consequential damaged to be proven at trial.

C. Punitive damages in an amount sufficient to punish this Defendant and deter others from like misconduct.

D. Injunctive relief against McDonald's USA (and all persons acting in concert with this Defendant) to enjoin them from committing the intentional tort alleged in Count IV.

E. Plaintiffs reserve their right to seek additional relief on Count III if the Connecticut Airport Authority approves Plaintiffs for continued operation of their Special Venues, but McDonald's attempts further interference or retaliation as threatened by Chiczewski.

V. Count V for Common Law Fraud, all Plaintiffs request the entry of judgment against McDonald's Corporation and McDonald's USA, LLC for:

A. Actual damages to be proven at trial.

B. Consequential damaged to be proven at trial.

C. Punitive damages in an amount sufficient to punish these Defendants and deter others from like misconduct.

VI. On Count VI for Disparate Treatment in violation of 42 U.S.C. §1981, and also under 42 U.S.C. §1988, all Plaintiffs request the entry of judgment imposing joint and several liability against all Defendants for:

A. Actual and consequential damages for economic and pecuniary injuries in amounts to be proven at trial.

B. Actual and consequential damages for emotional distress and the intangible injury resulting from the deprivation of civil rights.

C. Punitive damages sufficient to punish these Defendants and deter others from like misconduct.

D. Injunctive relief against further discriminatory conduct and to prevent further injury from past and ongoing discrimination.

VII. On Count VII for unlawful retaliation in violation of 42 U.S.C. §1981, and also under 42 U.S.C. §1988, all Plaintiffs request the entry of judgment imposing joint and several liability against all Defendants for:

A. Actual and consequential damages for economic and pecuniary injuries in amounts to be proven at trial.

B. Actual and consequential damages for emotional distress and the intangible injury resulting from the deprivation of civil rights.

C. Punitive damages sufficient to punish these Defendants and deter others from like misconduct.

D. Injunctive relief against further discriminatory conduct and to prevent further injury from past and ongoing discrimination.

VIII. In addition, to the extent available under law, on each Count, Plaintiffs request:

A. Prejudgment interest to the extent available by law.

B. Costs of suit.

C. Attorneys' fees; and

D. Such other relief available under law and deemed just and proper.

**ELECTION OF REMEDIES**

To the extent permitted under law, Plaintiffs reserve their elections of remedies.

**JURY DEMAND**

To the extent available under law, Plaintiffs demand trial by jury.

Dated: May 9, 2024

Michael Einbinder
EINBINDER & DUNN, LLP
112 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 391-9500
Email: me@ed-lawfirm.com

**Attorneys for Plaintiffs**

Michael Einbinder
Sabin Jackson
EINBINDER & DUNN, LLP
112 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 391-9500
Email: me@ed-lawfirm.com
skj@ed-lawfirm.com

**Attorneys for Plaintiffs**
**Seeking Admission *Pro Hac Vice***

Carmen D. Caruso (Illinois Bar #6189462)
William B. Whitner (Illinois Bar #6331564)
CARMEN D. CARUSO LAW FIRM
77 W. Washington Street, Suite 1900
Chicago, IL 60602
(T) (312) 626-1160
(F) (312) 276-8646

Email: cdc@cdcaruso.com
wbw@cdcaruso.com