UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GEORGE R. MICHELL; MICHELL NORTH LLC; MICHELL.BRADLEY LLC; and BERLIN FOODS LLC; UTICA FOODS LLC,

                                        Plaintiffs,

        -against-

MCDONALD'S CORPORATION, MCDONALD'S USA, LLC; JOSEPH CHICZEWSKI; and JEFF ROTH; JOHN CRONAN,

                                        Defendants.

**MEMORANDUM & ORDER
24-CV-3442 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs George R. Michell, Michell North LLC, Michell.Bradley LLC, Berlin Foods LLC, and Utica Foods LLC (collectively, "Plaintiffs" or "Michell") [1] brought this action against Defendants McDonald's Corporation and McDonald's USA, LLC (collectively, the "Corporate Defendants" or "McDonald's"), and Joseph Chiczewski, Jeff Roth, and John Cronan (the "Individual Defendants," and collectively with McDonald's, the "Defendants"), alleging various violations of state and federal law arising from Defendants' alleged race-based discrimination against him when they declined to renew his McDonald's franchises. [2] (*See generally* First Amended Complaint ("Am. Compl.") (Dkt. 55).) Premised on Defendants' alleged discrimination, Michell brings eight

---

[1] Plaintiff George R. Michell owns and operates 37 McDonald's restaurants through limited liability companies ("LLCs"). (Am. Compl. ¶ 9.) Michell is the principal member of Plaintiffs Michell.Bradley LLC, Michell North LLC, Berlin Foods LLC, and Utica Foods LLC, "through which he owns and operates five of his franchised McDonald's restaurants that have received formal notice of non-renewal by McDonald's." (*Id.* ¶ 10.)

[2] Each Individual Defendant was an officer, employee, or agent of McDonald's during the time period relevant to this action. (*See id.* ¶¶ 17-20.)

counts premised on state contract and tort law on the one hand, and federal civil rights law on the other. (*Id.*) Michell asks this court to award him damages, declaratory judgments, and injunctive relief. (*Id.* at ¶¶ 88-92.) Defendants now move to dismiss Counts III-VIII pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. to Dismiss for Failure to State a Claim ("Mot.") (Dkt. 61-1).) Michell opposes the motion. (Pls.' Resp. in Opp'n to Mot. ("Opp.") (Dkt. 73).) Michell also requests a pre-motion conference for his anticipated motion for leave to file a second amended complaint. (Pls.' Sealed Pre-Motion Conference Application ("Pls.' PMC App.") (Dkt. 83).) Defendants oppose Michell's attempt to further amend the pleadings. (Defs.' Response to Pls.' PMC App (Dkt. 87).) For the reasons that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion to dismiss is GRANTED as to Counts III, IV, V, and VIII, and DENIED as to Counts VI and VII. Michell's request for a pre-motion conference is DENIED as moot.

## I.   BACKGROUND[3]

### A.   McDonald's Franchise System

McDonald's is a restaurant brand with over 40,000 restaurants around the world. (Am. Compl. ¶ 23.) In the United States,

---

[3] The following facts are drawn from Plaintiffs' Amended Complaint and, for purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022). The court also relies on the terms of the parties' franchise agreement, executed by James Wong (National Franchising Director, McDonald's Corporation) and George R. Michell (Franchisee) on April 19, 2023, which Plaintiffs attached to their July 25, 2024 Motion for a Preliminary Injunction (the "Franchise Agreement"). (Apr. 19, 2023 Executed Franchise Agreement Between McDonald's Corporation & Franchisee George R. Michell ("Franch. Agr.") (Dkt. 29-3 at ECF pp. 8-20).) *See Bristol-Myers Squibb Co.*, 28 F.4th at 349 ("Because we assume the [plaintiffs'] factual allegations to be true on review of a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), the following facts are taken from the

McDonald's restaurants are almost exclusively owned and oper-
ated by franchisees. (*Id.* ¶ 23.)[4] A McDonald's franchisee operates
as an "independent contractor" and in the franchise agreement,
both McDonald's and the franchisee disclaim any intention to "be
partners, associates, or joint employers in any way." (*Id.* ¶ 45
(quoting Franch. Agr. ¶ 16).)

McDonald's maintains various programs and initiatives to sup-
port current and prospective franchisees. (*See, e.g., id.* ¶ 49
(describing McDonald's "Next Generation" program); *id.* ¶ 98
(describing McDonald's "Next Generation & Spousal Program");
Franch. Agr. ¶¶ 3-6 (describing services and other benefits
McDonald's provides to franchisees).)

One example is McDonald's "Next Generation" or "Next Gen"
program (the "Next Gen Program"). (Am. Compl. ¶ 49.) Through
this program, McDonald's "offers the adult children of existing
[franchisees] who have worked in the [franchises] to become
next generation [franchisees] by meeting defined qualifications."
(*Id.*) However, if a franchisee becomes ineligible while a Next
Gen candidate is in training, "McDonald's will place the candi-
date on hold for a maximum of one year." (*Id.* ¶ 98 (quoting
McDonald's Next Generation & Spousal Program Policy).) If the
franchisee "does not regain eligibility status within 12 months,"
McDonald's removes the candidate from the Next Gen program.
(*Id.*) If the franchisee does regain eligibility within 12 months,
McDonald's will lifts the hold, and the Next Gen candidate will
resumes the training program. (*Id.*)

---

Complaint and any documents upon which it relies.") (citing *Lentell v. Mer-
rill Lynch & Co.*, 396 F.3d 161, 165 (2d Cir. 2005)).

[4] The court uses "franchisees" to refer to the owner/operator of McDon-
ald's restaurants. The court uses "franchises" to refer to the McDonald's
restaurants themselves.

### B.  McDonald's Franchise Agreements

McDonald's franchisees enter into franchise agreements with McDonald's to operate restaurants under the McDonald's brand name. (*See id.* ¶¶ 23, 25.) The Franchise Agreement between McDonald's and Michell is an example of such an agreement. (*Id.* ¶ 26 (referring to but not citing the Franchise Agreement).)[5]

McDonald's franchise agreements require franchisees to follow McDonald's standards and policies to maintain uniform food, service, and cleanliness. (*See id.* ¶ 29 (referring to "Section 1(c) of McDonald's franchise agreements"); *see, e.g.,* Franch. Agr. ¶ 1(c).) Each franchisee must strictly adhere to these standards and policies as they exist upon execution of the franchise agreement and "as they may be from time to time modified." (Franch. Agr. ¶ 1(d).) In exchange for compliance, McDonald's grants its franchisees certain "right[s], license[s], and privilege[s]." (*Id.* ¶ 2(a) (enumerating each right, license, and privilege granted by McDonald's to the franchisee).)

Over the years, McDonald's has implemented new policies and standards that franchisees are required to meet. For example, in 2017, McDonald's announced the new, "Bigger, Bolder Vision 2020" program ("BBV 2020"). (Am. Compl. ¶ 63.) Through BBV 2020, Michell alleges that McDonald's "required its [franchisees] in the USA to make large and unprecedented reinvestments in their restaurants to conform to the Company's evolving visions for the brand in terms of restaurant appearance and technology, without limitation." (*Id.*)

---

[5] The court treats the Franchise Agreement as representative of all the other franchise agreements between McDonald's and Michell because these agreements are "identical in all relevant respects." (Defs.' Answer & Counterclaim ¶ 25; *see also* Am. Compl. ¶ 26 ("Most McDonald's Owner/Operators including Michell have signed McDonald's 'conventional' franchise agreement that, since 1990 or earlier, have been contracts of adhesion.").)

4

In 2018, McDonald's implemented six "National Franchising Standards" that were effective through December 31, 2022 and which franchisees had to meet to become eligible to, among other things: (1) acquire additional McDonald's restaurants (which McDonald's calls "Growth"); or (2) renew their franchise term for an additional term (which McDonald's formerly called "Rewrite" and now calls "granting a 'New Term'"). (*Id.* ¶¶ 27(a) (defining "Growth"), 27(c) (defining "granting a 'New Term'"), 36, 37(a), 37(b).) The six National Franchising Standards set standards for: (1) guest satisfaction; (2) operations; (3) people; (4) financial; (5) reinvestment; and (6) "Owner/Operator Involvement."[6] (*See id.* ¶ 36.) During the effective period of the National Franchising Standards from 2018 through December 31, 2022, McDonald's reviewed franchisees' compliance with the National Franchising Standards through periodic "Business Reviews" during which McDonald's "Regional Management" determined franchisees' eligibility for Growth and grant of a New Term. (*Id.* ¶ 38.)

Typically, McDonald's franchise agreements provide a 20-year term. (*See id.* ¶ 26.) By executing a franchise agreement, a franchisee "acknowledges" that McDonald's makes "no promise or representation" as to: (1) the "renewal of [a] franchise"; (2) the "grant of a new franchise"; or (3) the "offers of franchises for additional McDonald's restaurants." (Franch. Agr. ¶¶ 28(a), (h); *accord* Am. Compl. ¶ 218 ("McDonald's franchise agreements disclaim any promise or guarantee of franchise renewal[.]").)

---

[6] The term "Owner/Operator" is defined in the Amended Complaint to refer to McDonald's franchisees. (*See* Am. Compl. ¶ 23 ("McDonald's restaurants are franchised to Owner/Operators.").) McDonald's owns (or is the lessee) of the real estate and leases (or subleases) it to the Owner/Operator in exchange for the payment of rent that is usually based on an agreed percentage of sales." (*Id.* ¶ 24).) Plaintiff Michell is an Owner/Operator. (*Id.* ¶ 26.)

Around June 2022, McDonald's announced that its renewal process would be governed by a new policy, effective January 1, 2023 (the "New Term Policy"). (*See id.* ¶¶ 79-81.)[7] In this announcement, McDonald's said that it would use "objective criteria" to determine "whether a new 20-year franchise term will be granted." (*Id.* ¶ 79(a) (alterations adopted).) The announcement also stated that McDonald's would adopt "revised" National Franchising Standards. (*Id.* ¶ 79(b).) On January 1, 2023, McDonald's implemented a revised Owner/Operator Involvement Standard as part of its new 2023 National Franchising Standards (the "New Owner/Operator Involvement Standard"). (*Id.* ¶ 81.) The New Owner/Operator Standards authorized McDonald's to determine a franchisee's renewal eligibility based on a field officer's findings that, *inter alia*, the franchisee: (1) failed to maintain a "mutually beneficial working relationship with McDonald's Company staff"; (2) failed to sufficiently "'particip[ate]' and [be] 'positive' when attending various business or team meetings"; (3) failed to "act with highest standards of honesty, integrity, courtesy, professionalism, and ethical conduct in all direct and indirect dealings with the Company . . . and in all situations where the Brand could be connected to the [franchisee's] conduct"; (4) failed to "communicate[] in a timely, open, and transparent manner, especially regarding issues that impact the Brand;" or (5) failed to "be sufficiently 'collaborative and constructive' and . . . 'gain the trust and support of other [franchisees], suppliers, and the Company." (*Id.* ¶¶ 81(a)-(e) (quoting the New Owner/Operator Involvement Standard) (emphasis omitted).)

---

[7] Michell alleges that the New Term Policy's footnotes state that the "New Term Policy is not part of the Franchise Agreement" and that the policy's application "will differ depending upon the various facts and circumstances involved and it is not a contract right between [franchisees] and McDonald's." (Am. Compl. ¶ 43.)

### C.  Franchisee George Michell

Michell has been a McDonald's franchisee since 1990. (*Id.* ¶ 9.) Through multiple LLCs, Michell owns and operates 37 McDonald's restaurants in New York, Connecticut, Massachusetts, and New Jersey. (*Id.*)

Pursuant to a 2003 agreement with McDonald's, Michell also owns and operates eight non-McDonald's restaurants and bars (which McDonald's calls "Special Venues") at Bradley International Airport in Connecticut ("Bradley Airport").[8] (*Id.* ¶ 2.) Bradley Airport is overseen by the Connecticut Airport Authority ("CAA"), which issues master concessionaire leases to commercial tenants, including McDonald's. (*Id.* ¶ 10(a); *see also id.* ¶¶ 149-56.) In 2003, "McDonald's entered into a master concessionaire agreement with the [CAA] that allowed for a franchised McDonald's restaurant and required McDonald's to provide other restaurants and bars, offering diverse food and drinks, throughout the airport concourse." (*Id.* ¶ 68.) McDonald's then allowed Michell—as the subtenant—to "develop and operate" the airport restaurants and bars as Special Venues. (*Id.* ¶¶ 69, 149.) Each master lease has a term and expiration date, which may be extended; McDonald's 2023 master lease was set to expire in January 2025. (*See id.* ¶ 10(a).) Upon the expiration of the master lease's term, other companies bid for the master lease and the CAA selected a new master concessionaire. (*See id.* ¶¶ 151-56.)

Michell is Mexican American and an active member of the McDonald's Hispanic Owner/Operators Association ("MHOA"). (*Id.* ¶¶ 9, 59.) He is also one of the largest Hispanic franchisees of McDonald's restaurants in the United States. (*Id.* ¶ 59.) Over

---

[8] While Special Venues are not McDonald's-branded restaurants, McDonald's assigns them store numbers, like it does for McDonald's-branded restaurants. (*See* Am. Compl. ¶¶ 12(a)-(h) (enumerating Michell's eight Special Venues at Bradley Airport, including their names, McDonald's store numbers, and menu offerings).)

7

the years, McDonald's has recognized Michell's success as a successful Hispanic franchisee and "devoted public relations resources" to promote Michell's story as "a praiseworthy example of how minorities can succeed in McDonald's franchise ownership." (*Id.* ¶ 60.) Michell and his franchises have been "presented as a McDonald's success story" in local and national news outlets. (*Id.*).

Michell is also a father. His adult daughter, Larisa Michell ("Larisa"), gained "managerial experience" working in Michell's McDonald's franchises and was qualified to enter McDonald's Next Gen Program. (*Id.* ¶ 61.) Michell alleges that in April 2024, McDonald's said it would approve Larisa's acquisition of five of Mitchell's franchises, "but only if Michell agreed to McDonald's below market value offer for thirty of his restaurants." (*Id.* ¶ 62.)

As a franchisee, Michell interacts with various McDonald's officers and employees, including the Individual Defendants. (*See id.* ¶ 20.) The Individual Defendants' respective positions during the relevant time period involved overseeing and managing the regions in which Michell's McDonald's restaurants are located.[9] (*Id.* ¶¶ 17-19.)

### D.  Alleged Discrimination

Beginning in 2021, Michell encountered challenges at his McDonald's franchises, which received media attention. On December 30, 2021, the National Labor Relations Board ("NLRB") ruled against Michell, concluding that Michell retaliated against four employees and ordering injunctive relief and damages. (*See*

---

[9] The McDonald's officers and employees Michell interacted with include: Defendant Joseph Chiczewski, McDonald's Field Vice-President; Defendant Jeff Roth, Michell's Franchise Business Partner and a McDonald's Operations Officer; and Defendant John Cronan, McDonald's Operations Officer. (*Id.* ¶¶ 17-19.)

*id.* ¶ 103.)[10] The media reported on this adverse ruling shortly after the NLRB issued its decision. (*Id.*) Nevertheless, on April 19, 2022, a McDonald's Business Review report written by Defendant Cronan and McDonald's Franchise Business Partner Stephen Monahan concluded that Michell was in compliance with the National Franchising Standards. (*Id.* ¶¶ 73-75.)

On October 31, 2022, a media outlet reported that "Michell had agreed to pay approximately $1.1 million to the New York City Department of Consumer and Worker Protection ("DCWP")" for violations of New York City's Fair Workweek Law and Earned Safe Time and Sick Act by Michell's Brooklyn McDonald's restaurants. (*Id.* ¶ 91.) The news report also highlighted Michell's failure to comply with an earlier settlement brought under the same municipal law. (*Id.*)

On November 9, 2022, Chiczewski notified Michell that he no longer met the Owner/Operator Involvement Standard, citing Michell's failure to inform McDonald's about the DCWP case. (*Id.* ¶ 93.) Also in November 2022, Chiczewski: (1) told Michell that McDonald's wanted "Michell out of the system and that Michell should sell all of his McDonald's restaurants"; (2) "offered to purchase all of Michell's McDonald's restaurants at prices Michell believed was at least $100 million less than fair market value"; (3) said that if Michell did not sell his McDonald's restaurants, they would not be renewed; and (4) "made it clear that Larisa would only be approved to become a McDonald's [franchisee] if Michell sold his McDonald's restaurants and left the system as Chiczewski was demanding." (*Id.* ¶ 97.) Michell alleges that

---

[10] *See also* Office of Public Affairs, *Region 1-Boston Wins Administrative Law Judge Decision Against McDonald's Franchisee, Winning Reinstatement for Four Workers,* NLRB (Jan. 5, 2022), https://www.nlrb.gov/news-outreach/region-01-boston/region-1-boston-wins-administrative-law-judge-decision-against [https://perma.cc/36X9-RGPY] (last visited Sept. 11, 2025).

Chiczewski "repeated the substance" of these statements on "multiple occasions" and that he "rejected" Michell's attempts to negotiate a partial sale of his McDonald's restaurants. (*Id.* ¶¶ 100-01.) Michell further alleges that after November 2022 he attempted to "negotiate with McDonald's, but without success." (*Id.* ¶ 113.)

On January 11, 2023, Chiczewski sent Michell a "Change of Status" letter informing Michell that he "no longer met the National Franchising Standards" because of his "history" and "repeated inability to properly communicate and be collaborative with the Stamford Field Office." (*Id.* ¶ 115 (quoting the Jan. 11, 2023 Change of Status Ltr.).) As a result, Chiczewski and the McDonald's Stamford Field Office recommended Michell's ineligibility for renewal and Larisa's removal from the Next Gen Program. (*Id.* ¶ 117.) Specifically, Chiczewski and the McDonald's Stamford Field Office "recommended that McDonald's New Term Committee deny renewal" of four of Michell's McDonald's restaurants,[11] (*id.* ¶ 123), and deny renewal of his eight Special Venues at Bradley Airport, "even though these are not McDonald's franchises," (*id.* ¶ 125). Michell alleges that in conversations with Chiczewski and in an email dated February 17, 2023, he protested the findings and recommendations in the Change of Status letter and raised "his concerns of disparate racial treatment." (*Id.* ¶¶ 109-14). Michell alleges further that "McDonald's ignored and did not refute" his claim of "racially disparate treatment." (*Id.* ¶ 120.)

---

[11] "Based on the January 2023 Change of Status Letter, Chiczewski and the McDonald's Field Office recommended that McDonald's New Term Committee deny renewal to the four McDonald's restaurants identified in ¶ 10(a), (b), and (c)." (Am. Compl. ¶ 123.) The four restaurants (all with "Store #" assigned by McDonald's) are: (1) Store #28784 at Bradley Airport; (2) Store #11727 in Albany, New York; (3) Store #10953 in Schenectady, New York; and (4) Store #148 in Newington, Connecticut. (*Id.* ¶¶ 10(a)-(c).)

On July 5, 2023, the New York City Department of Health closed Michell's McDonald's restaurant in Brooklyn, New York (Store #13068) "after a walk-in refrigerator broke down." (*Id.* ¶ 126.) According to Michell, he "promptly told McDonald's about the closure and kept the Company posted as it quickly re-opened." (*Id.*) However, on July 21, 2023, McDonald's accused Michell of failing to disclose the full nature of the violations cited by the New York City Department of Health because his notice "fail[ed] to mention that the inspector also found mice droppings and filth flies." (*Id.* ¶ 127.) Michell disputes these allegations, arguing:

> The only reason Store #13068 . . . was temporarily closed was the malfunctioning refrigerator. Some flies and mice droppings were seen, as is common in big city restaurants despite professional pest control arrangements being in place, but the observed pest problem did *not* rise to the level of requiring restaurant closure under established board of health standards.

(*Id.* ¶ 127(a) (emphasis in original briefing).)

Nevertheless, McDonald's placed Store #13068 in an "internal cure process" even though the "refrigeration problem" had been fixed and the restaurant had "reopened with the board of health's permission." (*Id.* ¶ 128.) Michell attempted to invoke McDonald's informal dispute resolution procedure via the McDonald's Ombudsman process, but Michell alleges that he was denied a "full and fair Ombudsman process" because the "newly appointed Ombudsman deferred to the whims of the field office whose abusive conduct gave rise to the Michell's grievance." (*Id.* ¶ 130; *see also id.* ¶ 44(b) (describing the Ombudsman process which may be invoked to "resolve disagreements that inevitably arise in franchise relationships").)

On August 25, 2023, McDonald's reached a final decision to not offer renewal for four of Michell's McDonald's restaurants (Stores

#28784, #11727, #10953, and #148) and his eight Special Venues at Bradley Airport. (*Id.* ¶ 131.) In February 2024, McDonald's informed Michell it would not offer renewal of another McDonald's restaurant (Store #11542), for the same reasons it relied upon in its August 2023 decision concerning Michell's other restaurants. (*Id.* ¶ 132.) Michell alleges that McDonald's February 2024 decision "identified no operational issues and no breaches of the franchise agreement, regarding [Store #11542]." (*Id.*)

In early 2024, McDonald's also asserted that the Stamford Field Office would recommend the nonrenewal of "two additional Michell restaurants . . . in 2028." (*Id.* ¶ 133.) Concurrently, Michell discovered that McDonald's did not intend to reapply for its master lease at Bradley Airport, which allowed Michell to operate his Special Venues as a subtenant and was set to expire on January 31, 2025. (*Id.* ¶ 149.) McDonald's told Michell its decision not to reapply was a "business decision," but did not provide further explanation. (*See id.*) Upon learning this information, Michell told Chiczewski of his intention to apply for the master lease when McDonald's lease expired. (*Id.*) Michell submitted his bid to the CCA for the master lease on April 16, 2024.[12] (*Id.* ¶ 152.) Four days later, Chiczewski claimed that he was unaware of Michell's bid and "announced that unless Michell sells all his McDonald's restaurants," McDonald's would "attempt to block Michell from continuing to operate his Special Venues after January 2024 or seek other relief against Michell if he refuse[d] to abandon his Special Venues." (*Id.* at ¶ 153.) Ultimately, the CAA

---

[12] The Amended Complaint states that Michell submitted his bid on April 16, 2022. (*Id.* ¶ 152.) However, because Michell informed McDonald's that he intended to apply for the master lease after he learned, "[i]n early 2024," that McDonald's did not intend to reapply, the court believes that Michell's date of submission as written in the Amended Complaint was a typographical error and that Plaintiff meant to allege that he submitted his bid to the CAA on April 16, 2024. (*See id.* ¶¶ 149-52.)

rejected Michell's bid to become the next "master concessionaire" at Bradley Airport. (*Id.* ¶ 156.)

### E. Procedural Background

On May 9, 2024, Michell filed his initial Complaint. (*See* Compl. (Dkt. 1).) On July 25, 2024, Michell moved for a preliminary injunction to enjoin McDonald's from "entering into contracts with other persons or entities to replace Michell as their franchisee at the Bradley Airport McDonald's restaurant after January 31, 2025." (Pls.' Mot. for Prelim. Inj. (Dkt. 29) at 1.) On October 10, 2024, McDonald's filed its answer and a counterclaim asking the court to declare that Michell breached the Franchise Agreement. (*See* Defs.' Answer & Countercl. (Dkt. 51).)

On November 1, 2024, Michell amended his Complaint and added an eighth count. (*See generally* Am. Compl.)[13] Michell's claims are as follows: violations of the Connecticut Franchise Act (Count I); violations of the Connecticut Unfair Trade Practices Act (Count II); breaches and anticipatory breaches of the Franchise Agreement (Count III); promissory estoppel (Count IV); tortious interference with prospective economic advantage (Count V); common law fraud (Count VI); disparate treatment (Count VII); and retaliation (Count VIII).[14] (*See id.* ¶¶ 164-330.) On December 6, 2024, Defendants moved to dismiss Counts III through VIII, arguing that Michell failed to state a claim as to each of those counts. (*See generally* Mot.)

---

[13] The court granted Michell's request to file an amended complaint *nunc pro tunc.* (Text Order Dated Nov. 4, 2024.)

[14] Michell brings Counts I-VI against the Corporate Defendants. (Am. Compl. ¶¶ 164 (Count I), 178 (Count II), 193 (Count III), 217 (Count IV), 242 (Count V), 260 (Count VI).) He brings Counts VII and VIII against all Defendants—both the Corporate Defendants and the Individual Defendants. (*Id.* ¶¶ 288, 319.)

On January 21, 2025, the court terminated Michell's motion for a preliminary injunction as moot because Michell accepted an offer to purchase the restaurant at Bradley Airport. (Min. Entry & Order Dated Jan. 21, 2025 (Dkt. 77).) On January 13, 2025, Michell opposed Defendants' motion to dismiss. (*See* Opp.) On January 27, 2025, Defendants submitted their reply. (*See* Defs.' Reply in Support of Mot. ("Reply") (Dkt. 78).)

On September 10, 2025, Michell requested a pre-motion conference for his anticipated motion for leave to file a second amended complaint. (Pls.' PMC App.) Defendants oppose Michell's attempt to further amend the pleadings. (Defs.' Response to Pls.' PMC App.)

## II. LEGAL STANDARD

Rule 12(b)(6) provides for dismissal of civil cases for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[15] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Id.* "Dismissal under Rule 12(b)(6) is therefore appropriate only if it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Michael Grecco*

---

[15] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

*Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024), *cert. denied*, No. 24-768, 2025 WL 1678984 (U.S. June 16, 2025).

In deciding a motion to dismiss, the court accepts as true all factual allegations contained in the complaint and draws all reasonable inferences in the plaintiff's favor. *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020). In addition to the complaint, the court may consider "documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020). A document is "integral" to the complaint when the complaint "relies heavily upon its terms and effect." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). However, even if a document is "integral" to the complaint, the court may only rely upon such a document when it is "clear on the record" that no dispute exists regarding either "the authenticity or accuracy of the document" or the "relevance of the document." *Id.*

## III. DISCUSSION

Defendants move to dismiss Counts III through VIII, arguing that Michell fails to state a claim. (*See generally* Mot.) The court first determines the law applicable to each of the contested counts. The court then applies the applicable law to address the merits of Defendants' motion.

### A. Choice of Law

Michell asserts that this court has federal question jurisdiction over his federal claim and that the court has "supplemental jurisdiction over Michell's state law claims arising from a common

nucleus of operative facts." (Am. Compl. ¶ 21.)[16] Where jurisdiction is based on the existence of a federal question, courts "apply a federal common law choice of law analysis." *Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, 620 F. App'x 37, 42 (2d Cir. 2015). Under federal common law choice of law rules, courts "apply the law of the jurisdiction having the greatest interest in the litigation." *Id.* "When conducting a federal common law choice-of-law analysis, absent guidance from Congress, [the court] may consult the Restatement (Second) of Conflict of Laws." *Id.* The Restatement provides as follows:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6[17] to the transaction and the parties, in which . . . event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 196 (1971).

Count III is a contract claim. (Am. Compl. ¶¶ 193-216 (alleging breaches and anticipatory breaches of the parties' franchise agreements).) Under the Franchise Agreement, Michell and

---

[16] McDonald's does not dispute Michell's asserted bases of this court's jurisdiction. (*See generally* Mot.) Because the Amended Complaint alleges violations of federal law, the court has federal question jurisdiction over those federal claims and exercises supplemental jurisdiction as to the claims brought under state law because they "form part of the same case or controversy" as the federal claims. *See* 28 U.S.C. §§ 1331, 1367.

[17] Section Six enumerates seven factors "relevant to the choice of the applicable rule of law." *See* Restatement (Second) of Conflict of Laws § 6 (1971).

McDonald's agreed that "[t]he terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois." (Franch. Agr. ¶ 27.)[18] That agreement is evidence of an "effective choice of law by the parties" for disputes over the Franchise Agreement. *See* Restatement (Second) of Conflict of Laws § 196. Accordingly, the court applies Illinois law to Count III.

McDonald's asserts "that Connecticut law applies to Counts IV through VIII because Michell lives in Connecticut, his restaurant organization is headquartered there, and the events and communications relevant to his claims occurred . . . in [McDonald's] Stamford, Connecticut Field Office." (Mot. at 12 n.3.) Michell makes no affirmative argument that another state's law applies to these claims. (*See generally* Opp.) In addition, the parties almost exclusively cite Connecticut law in their briefing of these claims.[19] (*See generally* Mot.; Opp.; Reply.)

Count IV (common law fraud), Count V (promissory estoppel), and Count VI (tortious interference with prospective economic advantage at Special Venue locations) are the only other causes of action where state law is particularly instructive. (*See* Am. Compl. ¶¶ 217-87.) Given that Michell resides in Connecticut, his franchise operation is headquartered in Connecticut, and his

---

[18] The court considers the Franchise Agreement in deciding McDonald's motion to dismiss because Michell's claims—particularly his contract claim—rely "heavily upon [the Franchise Agreement's] terms and effect." *DiFolco*, 622 F.3d at 111. Accordingly, the court's consideration of the Franchise Agreement is proper because it is "integral" to the Amended Complaint and because it is "clear on the record" that no dispute exists regarding either "the authenticity or accuracy" or the "relevance of the [Franchise Agreement]." *Id.*

[19] The Second Circuit has said that a "general principle" of contact interpretation is that the parties can "establish choice of law" through "implied consent," including where "the parties' briefs assume that [a particular state's] law controls." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

communications with the Individual Defendants occurred in Connecticut, the court finds that Connecticut has the "greatest interest in the litigation." *Lola*, 620 F. App'x 37 at 42. Accordingly, the court applies Connecticut law to Counts IV, V, and VI.

Count VII (disparate treatment) and Count VIII (retaliation) are brought under federal civil rights law 42 U.S.C. § 1981. (*See* Am. Compl. ¶¶ 288-330.) "The court must apply the federal standard when assessing claims brought pursuant to federal law." *Menghi v. Hart*, 745 F. Supp. 2d 89, 105 (E.D.N.Y. 2010), *aff'd*, 478 F. App'x 716 (2d Cir. 2012). Accordingly, the court applies federal law to Counts VII and VIII.

In sum, Illinois law governs Count III, Connecticut law governs Counts IV-VI, and federal law governs Counts VII and VIII. Having determined the law applicable to Michell's claims, the court now addresses McDonald's Rule 12(b)(6) motion to dismiss Counts III-VIII. The court first addresses each state law claim challenged by Defendants, then jointly addresses Michell's federal civil rights claims challenged by Defendants.

### B. Breaches and Anticipatory Breaches of the Parties' Franchise Agreements (Count III)

Michell's breach of contract theory is that the Corporate Defendants abused their discretion and breached the implied covenant of good faith and fair dealing by making decisions arbitrarily, capriciously, and with improper motive. (*See* Am. Compl. ¶¶ 193-209.)

Under Illinois law, "[e]very contract implies good faith and fair dealing between the parties to it." *See Martindell v. Lake Shore Nat. Bank*, 15 Ill. 2d 272, 286 (Ill. 1958); *accord Barwin v. Vill. of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) ("A duty of good faith and fair dealing is implied into every Illinois contract."). While the implied covenant of good faith and fair dealing does not create an independent cause of action, *see Voyles v. Sandia*

*Mortg. Corp.*, 196 Ill. 2d 288, 297 (Ill. 2001) (explaining that "the covenant of good faith and fair dealing [i]s a rule of construction, rather than an independent source of tort liability"), a "violation of the [covenant] may give rise to a breach of contract claim," *Conviser v. DePaul Univ.*, 649 F. Supp. 3d 686, 709 (N.D. Ill. 2023).

"Illinois courts and courts interpreting Illinois law have interpreted the implied covenant of good faith and fair dealing in two different ways." *Id.* Under the first interpretation, known as the "construction aid" framework, the implied covenant of good faith and fair dealing does not come into play unless the contract is ambiguous and subject to more than one construction. *See id.* In other words, the implied covenant operates as a "construction aid" for a court to apply when determining "the intent of the parties where an instrument is susceptible of two conflicting constructions." *Id.* When a contract "is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." *Martindell*, 15 Ill. 2d at 286.

Under the second interpretation, known as the "reasonable discretion" framework, the implied covenant of good faith and fair dealing is not just a construction aid, but a requirement. *See Conviser*, 649 F. Supp. 3d at 709. However, the covenant becomes a requirement only in limited circumstances where "a contract specifically vests one of the parties with broad discretion in performing a term of the contract." *Eckhardt v. Idea Factory, LLC*, 456 Ill. Dec. 214, 226 (Ill. App. Ct. 2021); *accord Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 352 Ill. App. 3d 160, 165-66 (Ill. App. Ct. 2004) ("In order to plead a breach of the covenant of good faith and fair dealing, a plaintiff must plead existence of contractual discretion. . . . [T]he good-faith duty to exercise contractual discretion reasonably does not apply where no contractual discretion exists."). Plaintiffs can state a breach of

the implied covenant under the reasonably discretion framework by pleading: (1) the "existence of contractual discretion;" and (2) that the defendant failed to exercise its discretion "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Mid-W. Energy Consultants*, 352 Ill. App. at 165. Generally, the court "must defer to [the party's discretionary] interpretation unless it is arbitrary or unreasonable." *Diamond v. United Food & Com. Workers Union Loc. 881*, 329 Ill. App. 3d 519, 527 (Ill. App. Ct. 2002).

The "two interpretations do not necessarily conflict" and "some courts ask whether the contract is ambiguous *and* whether it imparts discretion on the parties." *Conviser*, 649 F. Supp. 3d at 709 (emphasis in original). Nevertheless, under both interpretations, "an implied covenant of good faith cannot overrule or modify the express terms of a contract." *Id.*

Michell argues that McDonald's abused its discretion under paragraphs 1(c) and 28(h) of the Franchise Agreement by adopting its 2023 New Term Policy and its New Owner/Operator Standards. (*See* Am. Compl. ¶¶ 201-02.) Further, he contends that McDonald's abused its discretion by determining that his McDonald's restaurants were not eligible for renewal, (*id.* ¶ 203 (citing Franch. Agr. ¶¶ 1(c), 28(h)), and by "demanding that Michell sell his thirty-seven McDonald's restaurants at coerce sale prices below market value," (*id.* ¶ 204 (citing Franch. Agr. ¶¶ 15, 28(h)). Michell also alleges that McDonald's breached the Franchise Agreement by: removing his daughter Larisa from the Next Gen Program; announcing that Michell could not cure his alleged violations of the New Owner/Operator Involvement Standard; threatening the nonrenewal of Michell's remaining franchise agreements; demanding that Michell sell all of his franchised McDonald's restaurants before their franchise terms expired; and

"non-renewing" Michell's eight Special Venues at Bradley Airport. (*See id.* ¶¶ 205-09.)

McDonald's moves to dismiss Michell's contract claim by invoking the construction aid framework. (*See* Mot. at 10; *see also* Reply at 1 (arguing that the implied covenant of good faith and fair dealing is a "tool" that "guides the construction of *specific contract language*" and requires "discretion granted in a contract be exercised reasonably") (emphasis added).) McDonald's argues that because "a plaintiff cannot invoke the covenant of good faith and fair dealing to override the plain language of a contract," Michell cannot invoke the covenant to "override the [Franchise Agreement's] plain language." (*Id.* (internal citations and quotation marks omitted).) McDonald's cites paragraphs 1(c) and 28(a) of the Franchise Agreement to argue that the former "simply requires franchisees to comply with McDonald's policies and standards," while the latter "gives McDonald's the absolute right to award franchises to operators of its choosing" and makes "no promise or representation as to [franchise] renewal." (Mot. at 9-10.) McDonald's further rejects Michell's application of the reasonable discretion framework, arguing that Michell "does not quote any language in the parties' [F]ranchise [A]greement that affords McDonald's discretion, and which McDonald's supposedly breached by exercising that discretion improperly." (*Id.* at 9.)

In his opposition, Michell invokes the reasonable discretion framework to argue that  under paragraph 1(c), "McDonald's must exercise good faith and fair dealing in implementing and applying its discretionary standards," (Opp. at 14), and cannot exercise its discretion "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties," (*id.* at 13). Specifically, Michell argues that paragraph 1 of the Franchise Agreement is "the product of McDonald's discretion," meaning McDonald's "must exercise its substantial discretion . . .

to create, modify, and apply its standards and policies including the Owner/Operator Involvement Standard reasonably and with proper motive." (*Id.*) Finally, Michell argues that paragraphs 28(a) and (h) of the Franchise Agreement do not "bar the parties from agreeing to renew" the franchises or immunize McDonald's exercise of discretion to issue new standards and policies. (*Id.*)

The parties agree that the Franchise Agreement includes an implied covenant of good faith and fair dealing. (*See* Mot. at 9 ("Unless expressly disavowed, a covenant of good faith and fair dealing is implied in every contract under Illinois law."); Am. Compl. ¶ 199 ("Under applicable Illinois law . . . the parties to McDonald's franchise agreements owe reciprocal duties of good faith and fair dealing to each other.").) However, each party frames its "arguments under different frameworks and thus, like two ships passing in the night, the parties' arguments sail past each other." *Conviser*, 649 F. Supp. 3d at 709. But ultimately, the ships must arrive at the same port: under Illinois law, the Franchise Agreement's express language trumps the implied covenant of good faith and fair dealing. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 396 (7th Cir. 2003); *see also* Restatement (Second) of Contracts § 203(b) (1981) (express terms are given greatest weight). Accordingly, the court first looks to the Franchise Agreement's text to determine whether Michell has stated a plausible claim for relief for the alleged breach of the implied covenant of good faith and fair dealing.

### 1. The Franchise Agreement's Express Terms

The relevant sections of the Franchise Agreement are paragraphs 1(c) and (d), 15, and 28(a) and (h).

Paragraph 1 is titled the "Nature and Scope of [the] Franchise." (Franch. Agr. ¶ 1.) Paragraph 1(c) states that "adherence by the Franchisee to [McDonald's] standards and policies" creates "[t]he foundation of the McDonald's System." (*Id.* ¶ 1(c).) Paragraph 1(d) then clarifies that "the Restaurant shall be operated

22

in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified." (*Id.* ¶ 1(d).) Paragraph 1(d) also states that the "provisions of this Franchise [Agreement] shall be interpreted to give effect to the intent of the parties stated in this paragraph 1." (*Id.*)

Paragraph 15 is the Franchise Agreement's assignment clause. (*Id.* ¶ 15.) It prohibits Michell, as the franchisee, from "assign[ing] or otherwise transfer[ring] in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently" his interest in the Franchise Agreement. (*Id.*)

Paragraph 28 enumerates various facts that the franchisee "acknowledge[s]" by entering the Franchise Agreement. (*Id.* ¶ 28). Specifically, paragraph 28(a) states that Michell acknowledges that there exists "no promise or representation as to the renewal of this Franchise or the grant of a new franchise." (*Id.* ¶ 28(a).) In paragraph 28(h), Michell also acknowledges that "[n]o future franchise or offers of franchises for additional McDonald's restaurants . . . have been promised to [him] and any other franchise offer shall only be in writing, executed by an officer of McDonald's, and specifically identified as a Franchise Agreement or Rewrite Commitment Letter." (*Id.* ¶ 28(h).)

Under Illinois law, "[a] contract is express '[w]hen it consists of words written or spoken, expressing an actual agreement of the parties.'" *Heffron v. Brown*, 155 Ill. 322, 326 (Ill. 1895). The Franchise Agreement states the contract's terms in writing, and accordingly, its language trumps the implied covenant of good faith and fair dealing. *See AB Volvo*, 349 F.3d at 396; *see also* Restatement (Second) of Contracts § 203(b). Plainly read, the contract permits McDonald's to renew or not renew its Franchise Agreement with Michell; indeed, by entering the Franchise Agreement Michell acknowledged that McDonald's made "no promise" to renew his franchises. (Franch. Agr. ¶ 28(a).) Further,

under paragraph 1 of the Franchise Agreement McDonald's required "strict adherence to McDonald's standards and policies as they exist now *and as they may from time to time modified.*" (*Id.* ¶ 1(d) (emphasis added).) Through the Franchise Agreement's express language, McDonald's retained the right to adopt new standards, including its 2023 New Term Policy and its New Owner/Operator Standards. (*Id.*)

McDonald's points to multiple cases in which courts have, interpreting McDonald's franchise agreements, "rejected the *precise* theory advanced by Plaintiffs here" as persuasive authority. (Mot. at 10 (emphasis in original briefing).) Michell rejects the application of two of these cases: *Payne v. McDonald's Corp.*, 957 F. Supp. 749, 758 (D. Md. 1997) (dismissing implied covenant claim because, under McDonald's franchise agreement, "the decision whether or not to renew the Broadway franchise was solely one for McDonald's to make") and *Zuckerman v. McDonald's Corp.*, 35 F. Supp. 2d 135, 143-44 (D. Mass. 1999) (citing paragraph 28(a) in rejecting claims that franchisees were entitled to renewal). (*See* Opp. at 13-14.) Michell argues that both *Payne* and *Zuckerman* are "inapposite" because the "franchisees [there] did not allege that McDonald's breached its duty" on the grounds of the New Owner/Operator Involvement Standard. (*Id.*)

While these cases are out-of-circuit and do not concern the New Owner/Operator Involvement Standards that Michell takes issue with here, the court nevertheless finds these cases instructive. In *Payne*, the court interpreted a clause in a 1974 McDonald's franchise agreement that is identical to paragraph 28(a) of the Franchise Agreement here. *See* 957 F. Supp. at 754. The *Payne* court determined that paragraph 28(a)—which states that the totality of the Franchise Agreement's terms are set out in the contract, and that the agreement provides franchisees with "no promise or representation as to the renewal of this Franchise or the grant of a new franchise"—makes clear that "the decision

whether or not to renew the . . . franchise was solely one for McDonald's to make." *Id.* at 758, 754 (explaining that under Illinois law, "a court in interpreting provisions of a contract looks first to the express language of the parties' agreement"). Similarly, in *Zuckerman*, the court interpreting a McDonald's franchise agreement reasoned that the covenant of good faith and fair dealing "never arises because the express terms of the license agreement are unambiguous: McDonald's is under no obligation to renew the license or grant plaintiffs a new license." 35 F. Supp. 2d at 143 (emphasis added). The court finds that the Franchise Agreement here operates in an identical manner: because the express terms of the Franchise Agreement are unambiguous, McDonald's is under no obligation to renew Michell's franchises or to grant Michell a new franchise.

Michell's claim for the alleged breach of the implied covenant of good faith and fair dealing "suffers a fatal defect at the threshold." *See Zuckerman* 35 F. Supp. 2d at 143. "[U]nder Illinois law, the covenant of good faith and fair dealing only applies where the contract terms are ambiguous," and in this case, "the parties' agreement concerning [renewal] is explicit." *Id.* Regardless of which framework is applied—whether it be the construction aid or the reasonable discretion framework—an implied covenant of good faith and fair dealing cannot overrule or modify the express terms of the Franchise Agreement. *See AB Volvo*, 349 F.3d at 396. The Franchise Agreement is clear that McDonald's made no promise to renew its franchises with Michell and that McDonald's is not obligated to enter into new franchise agreements with Michell. (Franch. Agr. ¶¶ 28(a), 28(h).) As a matter of law, the Franchise Agreement's express terms defeat Michell's contract claim based on an alleged breach

of the implied covenant of good faith and fair dealing. [20] For this reason, the court grants McDonald's motion to dismiss Count III.

### C.   Common Law Fraud (Count IV)

Under Connecticut law, the "elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Conroy v. Idlibi*, 343 Conn. 201, 205, n.1 (Conn. 2022). "Under the common law, a duty to disclose 'is imposed on a party insofar as he voluntarily makes disclosure.'" *DiMichele v. Perrella*, 158 Conn. App. 726, 731 (2015) (quoting *Duksa v. Middletown*, 173 Conn. 124, 127 (Conn. 1977)). In other words, "'[a] party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak.'" *Id.* at 731-32 (quoting *Duksa*, 173 Conn. at 127).

Fraud claims are subject to a higher pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b) applies to claims involving fraudulent omissions just as it applies to claims involving fraudulent misstatements. *See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

"To satisfy Rule 9(b), a complaint alleging fraud ordinarily must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Miller v. United States ex rel. Miller*, 110 F.4th 533,

---

[20] Michell's anticipatory breach claim brought on the grounds that McDonald's threatened not to renew his franchise agreements, (Am. Compl. ¶ 207), also fails for the same reason.

543-44 (2d Cir. 2024); *accord DeWitt v. Gill & Gill Architects, LLC*, No. FSTCV095011135S, 2011 WL 6271252, *4 (Conn. Super. Ct. Nov. 22, 2011) ("A plaintiff cannot make general assertions of fraudulent misrepresentations, but must plead particular facts demonstrating what the representations were and how they were false.") (emphasis in original) (citing *Maruca v. Phillips*, 139 Conn. 79, 81 (Conn. 1952)).

### 1. Fraud by omission

Under Connecticut law, to state a viable fraud by omission claim, a complaint must plausibly allege "a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak." *DiMichele*, 158 Conn. App. at 731.

Michell alleges that the Corporate Defendants committed fraud by omission by failing to disclose that "McDonald's knew it was going to change its established course of dealing" with regard to franchise renewals and "purposefully inducing continuing franchisee reinvestment based on the course of dealing it did not intend to honor." (*See* Am. Compl. ¶¶ 217, 225.) Specifically, Michell alleges that since he became a McDonald's franchisee over 30 years ago, he has relied on the "course of dealing" that "compliance with McDonald's (previously) objective National Franchising Standards created eligibility for franchise renewal, and once eligible, [a franchisee] could count on being renewed absent extraordinary circumstances." (*Id.* ¶ 219.) He also alleges that "[t]his course of dealing was firmly established when McDonald's launched its BBV 2020 initiative in or about 2017." (*Id.* ¶ 220.) Michell alleges further that when McDonald's began implementing BBV 2020, the president of McDonald's USA (the "McDonald's President") "personally reassured" franchisees that "the established course of dealing would remain in place" and that franchisees who "embraced McDonald's vision in BBV 2020 and made the unprecedented reinvestments would be rewarded

long-term with franchise renewals." (*Id.* ¶ 221.) Michell alleges that he relied on the McDonald's President's 2017 reassurance to invest nearly $24 million in his McDonald's restaurants and Special Venues at Bradley Airport. (*Id.* ¶ 222.) Michell claims that the McDonald's President's 2017 reassurance amounts to fraud by omission because on a "date unknown" and "to be determined in discovery," McDonald's "knew it was going to change its established course of dealing to empower McDonald's to withhold franchise renewals from [franchisees] that it wished to reject for subjective reasons," and failed to make that intention known to franchisees at the time. (*Id.* ¶ 225; *see also id.* ¶ 227 (arguing that the 2018 National Franchising Standards' statement that a franchisee who "consistently meets or exceeds the Standards is eligible to be offered a rewrite upon expiration of his/her existing franchise" "reinforced McDonald's fraud by omission" because "McDonald's knew it would no longer honor the old course of dealing").)

Michell's fraud by omission claim must be dismissed because it is not pleaded with the particularity required by Rule 9(b). The only paragraphs of the Amended Complaint that allege that McDonald's spoke but failed "to [simultaneously] disclose known facts," *DiMichele*, 158 Conn. App. at 731, are paragraphs 64 and 221. Paragraph 64 alleges:

> In announcing BBV 2020 during a meeting at its headquarters in Chicago, the [McDonald's President] . . . explained (in substance) that BBV 2020 was a new direction for McDonald's, that Owner/Operators who did not embrace the new vision and reinvest at the required levels should leave, but Owner/Operators who participated would be rewarded over the long term as McDonald's valued business partners.

(Am. Compl. ¶ 64.) Paragraph 221 alleges:

> McDonald's took a major step toward its future when it implemented BBV 2020, but the reinvestment requirements

> were unprecedented, which is why the [McDonald's Presi-
> dent] . . . personally reassured the Owner/Operators that the
> established course of dealing would remain in place and that
> the Owner/Operators that embraced McDonald's vision in
> BBV 2020 and made the unprecedented reinvestments
> would be rewarded long-term with franchise renewals.
> (¶64).

(*Id.* ¶ 221.) These allegations, without more, do not meet the heightened pleading standard for fraud. Nowhere in these two paragraphs—nor in the Amended Complaint more broadly— does Michell "specify the statements" that he contends are fraudulent. *Miller*, 110 F.4th at 543-44. He also fails to identify the speaker by name. In addition, Michell alleges that "*[o]n a date unknown to be determined in discovery*, McDonald's *knew* it was going to change its established course of dealing to empower McDonald's to withhold franchise renewals from Owner/Operators that it wished to reject for subjective reasons." (Am. Compl. ¶ 225 (emphases added).) However, the purpose of the higher pleading standard for fraud claims is to discourage exactly this kind of discovery. *See Miller*, 110 F.4th at 544 (observing that fraud claims are subject to a higher pleading standard to "discourage[] plaintiffs from using the litigation process to discover hypothetical wrongdoing"). Absent a more fulsome accounting of what exactly the McDonald's President said when he announced BBV 2020 in 2017, or a showing that the content of those statements conflicts with the company's alleged knowledge that it would *not* adhere to the alleged "course of dealing" at that time, the court must dismiss Michell's fraud by omission claim. *See Leung v. L.*, 387 F. Supp. 2d 105, 114 (E.D.N.Y. 2005) (dismissing fraud claims because the complaint purportedly "detail[s] the alleged misstatements in only the most general terms, and thus largely fail[s] to meet the pleading burden established by Rule 9(b)").

2.    Affirmative fraud

Under Connecticut law, a fraudulent misrepresentation claim "has four elements: (1) a false representation was made by the defendant as a statement of fact; (2) the statement was known to be untrue by the defendant; (3) the statement was made with the intent to induce reliance; and (4) the other party relied on the statement to its detriment." *Companions & Homemakers, Inc. v. A&B Homecare Sols., LLC*, 348 Conn. 132, 144, 302 A.3d 283, 290 (2023).

Michell alleges that the Corporate Defendants affirmatively defrauded Michell through McDonald's June 2022 announcement of the New Owner/Operator Involvement Standard, in which "McDonald's falsely represented . . . to every Owner/Operator in the United States that beginning in 2023 franchise renewals would be decided 'objectively' under the 2023 New Term Policy." (Am. Compl. ¶¶ 217, 229.) Specifically, Michell alleges that in a letter to franchisees communicating this announcement, McDonald's wrote: "[W]e are asking owner/operators to apply for a New Term—with expectation and assessment criteria that capture performance history. **Objective criteria will determine if a new 20-year franchise term will be granted.**" (*Id.* ¶ 229 (emphasis in pleading).) Michell alleges that this statement was "an intentional, blatant lie" because the New Owner/Operator Involvement Standard "that would be used as a criteria for franchise renewal was extremely subjective to a degree never before seen by long-term Owner/Operators like Michell with more than 30 years' experience and course of dealing with McDonald's." (*Id.* ¶ 230.) In sum, Michell alleges that McDonald's June 2022 pledge to use "objective criteria" was false because at that time McDonald's knew it would use "extremely subjective" criteria.

Michell's affirmative fraud claim fails for two reasons. *First*, Michell has not plausibly alleged that when McDonald's made

this statement, it simultaneously intended not to fulfill its promise to objectively determine which franchises would be renewed. Because McDonald's alleged statement concerns how the New Owner/Operator Involvement Standard would be applied *in the future*, Michell was required to also allege that McDonald's had a "present intent not to fulfill the promise." *Brown v. Otake*, 164 Conn. App. 686, 706 (2016) (noting that misrepresentations ordinarily "must relate to an existing or past fact"). The Amended Complaint makes no such allegation.

*Second*, McDonald's statement that it would apply "[o]bjective criteria" in determining franchise renewal amounts to non-actionable puffery—not fraud. *See NetScout Sys., Inc. v. Gartner, Inc.*, 334 Conn. 396, 424 n.15 (2020) (defining "puffery"). The Supreme Court of Connecticut has recognized that "[a] claim of objectivity . . . is often considered nonactionable puffery because it is unlikely to induce reliance and is insusceptible to being proved true or false." *Id.* Here, McDonald's "claim of objectivity" was "unlikely to induce [Michell's] reliance," especially in light of Michell's independent contractual obligations to comply with McDonald's current and future "standards and policies." *Id.* (*See* Franch. Agr. ¶ 1(d).) Accordingly, Michell has failed to plead a plausible fraud claim under Connecticut state law. Because Michell failed to plausibly plead a common law fraud claim, the court grants McDonald's motion to dismiss Count IV.

## D.  Promissory Estoppel (Count V)

Under Connecticut law, "to prevail in a cause of action sounding in promissory estoppel, a plaintiff must convince the jury that (1) the promisor has failed to honor a clear and definite promise that (2) the promisor reasonably should expect to induce detrimental action or forbearance on the part of the promisee or a third person, and (3) the promise does, in fact, induce detrimental action or forbearance in reasonable reliance on the promise." *Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 338

31

Conn. 189, 209 (Conn. 2021). The second element must be examined objectively, analyzing whether "a promisor could reasonably have expected [the promise] to induce reliance." *Saye v. Howe,* 886 A.2d 1239, 1247 (Conn. App. Ct. 2005). "Whether a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made." *Second St., Inc. v. DeFeo,* No. CV095008437, 2011 WL 4032015, at *3 (Conn. Super. Ct. Aug. 22, 2011) (citing *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 17, n. 6 (Conn. 1995)). "[A] cause of action for promissory estoppel accrues when the defendant fails to fulfill its promise." *Weiss v. Smulders*, 313 Conn. 227, 245 (Conn. 2014). Generally, a promissory estoppel claim cannot contradict the language of an enforceable contract. *See Kent Literary Club*, 338 Conn. at 210.

Michell brings a promissory estoppel claim against the Corporate Defendants, arguing that "McDonald's has expressly or implicitly promised renewal franchise agreements in exchange for Michell choosing to make optional, but substantial, monetary investments in his franchise restaurants and complying with McDonald's standards." (Am. Compl. ¶¶ 242, 244.) He pleads promissory estoppel "in the alternative to" breach of contract and "in response to McDonald's arguments that it does not owe Michell . . . a contractual duty of good faith and fair dealing in deciding whether to grant the Owner/Operator a New Term on the expiration of his . . . franchise agreement(s)." (*Id.* ¶ 243.)

McDonald's moves to dismiss Michell's promissory estoppel claim on the grounds that it contradicts the express terms of the Franchise Agreement and that Michell fails to plausibly plead that the parties made a clear and definite promise. (*See* Mot. at 12-13.) Michell rejects these arguments, arguing that he pleaded "each element of [his promissory estoppel] claim" and that "[n]othing

more is required." (Opp. at 15-16.) Michell's promissory estoppel claim fails for three reasons.

*First,* the Supreme Court of Connecticut has said that "when an enforceable contract exists[,] parties cannot assert a claim for promissory estoppel on the basis of alleged promises that contradict the written contract." *Kent Literary Club,* 338 Conn. at 210 ("Put differently, a plaintiff cannot use the theory of promissory estoppel to add terms to a contract that are entirely inconsistent with those expressly stated in it."). Here, the Franchise Agreement's express terms state that franchise renewal is not guaranteed, (*see* Franch. Agr. ¶ 28(a)), foreclosing Michell's promissory estoppel claim, *Kent Literary Club,* 338 Conn. at 210.

*Second,* Michell has not plausibly alleged the first two elements of a promissory estoppel claim. McDonald's *did not* make a clear and definite promise that his franchises would be renewed. And McDonald's "is not liable to [Michell] who [allegedly] has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." *D'Ulisse-Cupo,* 202 Conn. at 213. Whether McDonald's alleged promise could reasonably be expected to induce Michell's reliance must be assessed from McDonald's' perspective. *See Saye,* 886 A.2d at 1247. "[I]n light of the circumstances under which the representation was made," McDonald's' alleged promise could not be expected to induce Michell's reliance. *DeFeo,* 2011 WL 4032015, at *3. As the court noted *supra* in Part III.C.1, the Amended Complaint does not include the actual statements made by the McDonald's President in announcing the BBV 2020 program, limiting the court's analysis. However, even based on the Amended Complaint and Franchise Agreement's text alone, the court rejects Michell's interpretation that McDonald's promised him franchise renewal. Similarly, while Michell alleges that McDonald's promised him that it would use "objective standards," (Am. Compl. ¶¶ 248-49),

Michell conflates this promise with a promise of franchise re-
newal that never existed. McDonald's could not have been
expected to bind itself to its past and evolving standards, espe-
cially because the parties agreed that those standards could be
modified at McDonald's discretion "from time to time." (*See*
Franch. Agr. ¶ 1(d).)

*Third*, Michell's request that this court enjoin McDonald's from
refusing to renew Michell's franchise agreements flies in the face
of the spirit of injunctive relief. (*See* Am. Compl. ¶ 258.) Michell
essentially asks this court to mandate that McDonald's renew its
franchise agreements with Michell. (*See id.*) The Supreme Court
of Connecticut has made clear that "mandatory injunctions"—
orders that "command[] a party to perform some affirmative
act"—are "drastic remedies." *Kent Literary Club*, 338 Conn. at
238-39. Under Connecticut law, this court may only grant such
relief "under compelling circumstances." *Id.* This case does not
present one of those circumstances. Requiring McDonald's to re-
new its franchise agreements with Michell would put this court
"in the undesirable position of having to monitor, construe, and
police the parties' private conduct, relationship, and contractual
dealings on an ongoing basis." *Id.* The court declines Michell's
invitation to do so and grants McDonald's' motion to dismiss
Count V.

### E. Tortious Interference with Prospective Economic Advantage at Special Venue Locations (Count VI)

Under Connecticut law, "the elements of a claim for tortious in-
terference with business expectancies are: (1) a business
relationship between the plaintiff and another party; (2) the de-
fendant's intentional interference with the business relationship
while knowing of the relationship; and (3) as a result of the in-
terference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v.
Com-Tronics, Inc.*, 255 Conn. 20, 27 (Conn. 2000). However, the
Supreme Court of Connecticut "has held that, in an action for

tortious interference, not every act that disturbs a contract or business expectancy is actionable." *Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 868 (Conn. 2015). "For a plaintiff successfully to prosecute an action for tortious interference it must prove that the defendant's conduct was *in fact* tortious." *Id.* (emphasis added). Because a plaintiff "must [ultimately] prove that the defendant's conduct was in fact tortious," a plaintiff must also "plead . . . at least some improper motive or improper means." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 805-06 (Conn. 1999). In other words, the plaintiff must "demonstrate malice on the part of the defendant" and "bears the burden of alleging . . . 'lack of justification' on the part of the [defendant]." *Id.* at 806 (quoting Restatement (Second) of Torts § 766, Comment (s) (1979)). In the scope of a tortious interference claim, "malice" requires a showing of a defendant's "intentional doing of a wrongful act without just cause or excuse with an intent to inflict an injury or implied evil intent." *Hi-Ho Tower Inc.*, 255 Conn. at 29, n.8; *accord Daley*, 249 Conn. at 806 ("The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but 'intentional interference without justification.'") (quoting Restatement (Second) of Torts § 766, Comment (s) (1979)).

Michell alleges that the Corporate Defendants committed a tortious interference with his prospective economic advantage at his Special Venue locations at Bradley Airport. (*See* Am. Compl. ¶¶ 260-61.) Michell contends that: (1) he and Michell.Bradley LLC "have valuable, actual, and prospective business relationships at Bradley Airport, and have invested great time, money, and effort developing these relationships"; (2) he and Michell.Bradley LLC "had the reasonable expectation they could continue to own, operate, and expand their Special Venues after January 31, 2025, when the current sub-leases end"; and (3) McDonald's knew of these relationships, knew of Michell's investments developing

35

these relationships, and knew that Mitchell "had every reasonable expectation of continuing those relationships for another 18-year term." (*Id.* ¶¶ 261-63.) Michell further alleges that "McDonald's intentionally interfered with Michell's prospective business relationships in his Special Venues after January 31, 2025" by: (1) "pretend[ing] [the Special Venues] are McDonald's 'franchises'," (*id.* ¶ 264(a)); (2) "wrongfully announc[ing] the non-renewal of Michell's Special Venues," (*id.* ¶ 264(b)); (3) "claim[ing] [the] reason for not renewing Michell's McDonald's restaurant franchises (his alleged non-compliance with the [New] Owner/Operator Involvement Standard) has no application to the Special Venues as Michell has no 'involvement' with McDonald's regarding the Special Venues other than paying rent," (*id.* ¶ 264(c)); and (4) "not supporting Michell's bid [for the master lease agreement at Bradley airport] but supporting the competitive bids" after McDonald's chose not to re-apply to remain the master concessionaire at Bradley Airport," (*id.* ¶ 275).

McDonald's moves to dismiss Michell's tortious interference claim, arguing that "McDonald's did nothing tortious by deciding not to submit a bid to be the master concessionaire at the Bradley airport after January 2024 or by supporting other bidders by agreeing to sublease the restaurant premises from them if they were awarded the master concessionaire contract." (Mot. at 18.)

The court addresses each required element of a tortious interference claim. *First*, as an Owner/Operator of Special Venues at Bradley Airport for over 20 years, Michell has an established business relationship with the CAA. (*See* Am. Compl. ¶ 261.)

*Second*, Michell plausibly pleaded that McDonald's knew of and interfered with his relationship with the CCA. McDonald's knew of Michell's relationship with the CCA because McDonald's contractually stood between Michell and the CCA. (*See id.* ¶¶ 68-72 (noting that "McDonald's entered into a master concessionaire agreement with the [CCA] that allowed" McDonald's to contract

with Michell to operate a McDonald's restaurant and eight Special Venues at Bradley Airport). Additionally, Michell alleges that after he learned that McDonald's would not reapply to be the master concessionaire at Bradley Airport, he "quickly informed" Chiczewski that he planned to "independently apply for a master concessionaire lease to commence in January 2025," after McDonald's agreement with the CCA expired. (*Id.* ¶ 150.) Michell further alleges that despite knowing about his prospective bid, Chiczewski "falsely claimed he did not know Michell would be independently applying for the master concessionaire lease" and "announced that unless Michell s[old] all his McDonald's restaurants as Chiczewski ha[d] demanded since November 2022, McDonald's would attempt to block Michell from continuing to operate his Special Venues after January 2025." (*Id.* ¶ 153.) In fact, McDonald's did ultimately support other bids for the master concessionaire lease and Michell's bid failed. (*See id.* ¶ 156.)

According to Michell, McDonald's claimed that McDonald's decision not to reapply for the master concessionaire lease at Bradley Airport was a "'business decision.'" (*Id.* ¶ 149.) However, Michell alleges that "McDonald's never explained the alleged business reasons," (*id.*), and that McDonald's "acted contrary to its own business interests," even going so far as to "assert [it] would prefer to abandon the continued opportunity for a continued [] restaurant at Bradley Airport rather than acquiesce in Michell obtaining the [] lease," (*id.* ¶¶ 154-55).

Michell's allegations satisfy the "malice" requirement because Michell's allegations demonstrate that McDonald's actions were "without justification." *Daley*, 249 Conn. at 806. Further, under Connecticut law, a plaintiff must only allege an intentional, wrongful act without just cause or excuse—which Michell has done. *See Hi-Ho Tower Inc.*, 255 Conn. at 29, n.8; *see also Daley*, 249 Conn. at 806. While McDonald's argues that it was well

within its right not to support Michell's bid for the master concessionare lease at Bradley Airport, and to support other bids, (Mot. at 18-19), the court must accept the truth of Michell's factual allegations; thus, the court finds that it would be improper to dismiss Michell's claim for tortious interference at this early stage without permitting discovery into how and why McDonald's opposed Michell's bid. *See Landmark Inv. Grp., LLC*, 318 Conn. at 869 ("Whether a defendant's interference is tortious is a question of fact for the jury.").

*Third*, Michell has plausibly alleged that he suffered "actual loss" as a result of McDonald's interference. *See Hi-Ho Tower, Inc.*, 255 Conn. at 27. Connecticut courts have held that "allegations of generalized future loss are sufficient in tortious interference cases, where the impact of the interference is not always immediately measurable." *Henry v. Olshan*, No. KNLCV156023394S, 2015 WL 9595332, at *2 (Conn. Super. Ct. Nov. 27, 2015) (citing *Hi-Ho Tower, Inc.*, 255 Conn. at 31). As Michell alleges that his bid's rejection could cause "the [future] loss of nearly $12 million in revenue" and has caused a current loss "of nearly $4 million in improvements," (Am. Compl. ¶¶ 70-71, 152, 155-56), Michell has adequately pleaded generalized future losses. Furthermore, Michell has plausibly alleged that he was not awarded the contract because of McDonald's tortious interference with his bid.

Accordingly, the court finds that Michell plausibly alleged a tortious interference claim.[21] The court denies McDonald's motion to dismiss Count VI.

---

[21] The court acknowledges that Michell "has received and accepted an offer to purchase the restaurant at Bradley Airport." (Min. Entry and Order Dated Jan. 21, 2025.)

### F.   Deprivation of Civil Rights (Counts VII and VIII)

Michell brings two civil rights claims against all Defendants: (1) disparate treatment (Count VII) and (2) retaliation (Count VIII). (*See* Am. Compl. ¶¶ 288-330.) The court first addresses Michell's disparate treatment claim, then turns to his retaliation claim.

#### 1.   Disparate treatment

"To state a § 1981 claim, a plaintiff must allege that: '(1) he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute.'" *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam)).

"To survive a motion to dismiss, a plaintiff must specifically allege the circumstances giving rise to a plausible inference of racially discriminatory intent." *Id.* "Discriminatory intent may be alleged explicitly via direct evidence, or implicitly by way of circumstantial evidence that supports an inference of discrimination." *Dames v. JP Morgan Chase & Co.*, No. 22-CV-6962 (NGG) (SJB), 2023 WL 5047776, at *3 (E.D.N.Y. Aug. 8, 2023). "A plaintiff's naked allegation that the defendant acted based on the plaintiff's race and color is too conclusory to survive a motion to dismiss." *Id.* (citing *Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir.1988) (en banc)). Furthermore, "a complaint that sets forth other possible motives for the alleged conduct, and does not contain specific facts supporting a claim of racial animus, contradicts a claim of racial discrimination." *Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11-CV-3327 (ER), 2013 WL 417406, at *9 (S.D.N.Y. Feb. 4, 2013). "An inference of discrimination can arise from circumstances including," among other things, "the more favorable treatment of employees not in the protected group." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). "When discriminatory intent is in question,

courts are cautious of summary adjudication." *Hicks v. IBM*, 44 F. Supp. 2d 593, 598 (S.D.N.Y. 1999).

Section 1981 protects minorities' rights to, among other things, "make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Second Circuit has clarified that "Section 1981 applies to racial discrimination in the making and enforcement of *all* contracts, not just employment contracts." *Tadros v. Coleman*, 898 F.2d 10, 11 (2d Cir. 1990) (per curiam) (emphasis added). Accordingly, courts in this circuit have recognized that Section 1981 "applies to a broader range of relationships than just that of employer and employee" and concluded that independent contractors also have right of action under Section 1981. *Brathwaite v. Sec. Indus. Automation Corp.*, No. 6-CV-300 (ERK) (JMA), 2006 WL 8439237, *5 (E.D.N.Y. Dec. 1, 2006); *accord D'Ambrosio v. Bast Hatfield, Inc.*, No. 12-CV-1895 (NAM) (TWD), 2017 WL 6388889, *7 (N.D.N.Y. Sept. 28, 2017) ("Section 1981 protects not only individuals but also independent contractors, including artificial entities."), *aff'd*, 737 F. App'x 44 (2d Cir. 2018).

For the following reasons, the court finds that Michell has plausibly pleaded a disparate impact claim under Section 1981.

*First*, Michell has adequately pleaded that he is a member of a racial minority because "Hispanics comprise a distinct race for purposes of [Section] 1981." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016). (*See* Am. Compl. ¶ 6 ("Michell is a self-made man, proud of his heritage as a Hispanic American.").)

*Second*, Mitchell has alleged that the discrimination concerns a protected activity enumerated in Section 1981—the right "to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). (*See* Am. Compl. ¶ 290(a).) Although Michell is an independent contractor and not a McDonald's employee, (*see* Franch. Agr. ¶ 16), "Section 1981 applies to racial

discrimination in the making and enforcement of all contracts, not just employment contracts," *Tadros*, 898 F.2d at 11.

*Third,* as to the second element—an intent to discriminate on the basis of race by Defendants—Michell offers both direct and indirect evidence to support his claim that McDonald's acted with discriminatory intent.

The court first addresses Michell's direct evidence of discriminatory intent. Direct evidence of discriminatory intent must include "racial undertones, remarks or actions that might give rise to a plausible inference of discrimination." *Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc.*, No. 21-CV-5749 (JMW), 2023 WL 2632461, at *6 (E.D.N.Y. Mar. 24, 2023). "[A]ll words must be carefully read and considered in context, as they could easily take on different meanings depending on the circumstances." *Id.* "[T]he same language, used in different settings, may mean very different things." *Id.* For example, comments made by a mentor "about blacks on welfare, . . . send them to school, clean them up and they still belong in the cotton field," and "I'm tired of black people taking taxes," sufficiently give rise to an inference of discriminatory intent. *Hicks*, 44 F. Supp. 2d at 598. Meanwhile, a comment by a direct supervisor about a bloodshot eye, stating, "[i]t must be the marijuana," is "tasteless and derogatory." *Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 94 (D. Conn. 2011). However, "its meaning and intent remain subject to interpretation" and therefore would not raise an inference of racial discrimination. *Id.*

As direct evidence of discrimination, Michell alleges that because of his Hispanic heritage, McDonald's falsely accused him of the unlawful hiring of migrants, (Am. Compl. ¶¶ 135-38, 301), falsely suggested that he set unreasonable prices for his menu items, (*id.* ¶¶ 139-48, 302, 304), and portrayed Michell as operating "dirty restaurants" by "falsely accusing Michell of lying to

McDonald's about the presence of filth flies and rodent droppings" in Michell's Coney Island restaurant, (*id.* ¶¶ 126-28, 303).

With regard to the allegation that Michell hired or wanted to hire migrants who were ineligible to work in the United States, Michell does not specify the specific statement made by McDonald's Operations Officer Jeff Roth, but simply states that at a meeting with franchisees in Sarasota, Florida on or about January 18, 2024, "Roth falsely accused Michell of announcing . . . an alleged plan . . . to violate state or federal law by hiring migrants." (Am. Compl. ¶ 135.) However, according to Michell, Michell was actually "advocating [for] the *lawful* hiring of migrants . . . [by] echoing the welcoming attitude [to hiring legal migrants] McDonald's has expressed to its Owners/Operators." (*Id.* ¶ 136 (emphasis in original).) For example, in an October 11, 2022 email to McDonald's Government Relations Manager Kenya Handy-Hilliard, Michell indicated his interest in being added to the list of franchisees seeking to employ migrants. (*See id.*) Michell contends that he was "disparately targeted for suggesting his support for [this] program." (*Id.* ¶ 301.) Because Michell fails to plead any specific comments from Roth that demonstrate racial animus, the court finds that this unsupported allegation "is too conclusory to survive a motion to dismiss." *See Sokolovsky,* 2023 WL 5977298, at *15. And Michell's emails with Handy-Hilliard are devoid of any "racial undertones, remarks or actions that might give rise to a plausible inference of discrimination." *Radar Sports Mgmt., LLC,* 2023 WL 2632461, at *6. The court finds this evidence insufficient to plausibly allege discriminatory intent.

With regard to Michell's allegation that he improperly set retail prices at his McDonald's restaurants, Michell alleges that "[o]n February 8, 2024, Jeff Roth of McDonald's falsely suggested that Michell was deficient in not utilizing industry-standard advisors when setting his retail prices at his McDonald's restaurants on

the turnpike in Connecticut." (Am. Compl. ¶ 140.) Michell alleges further that "[t]his particular incident suggests that McDonald's believes [he] is less intelligent or less informed" which is "a form of ugly racial stereotyping." (*Id.* ¶ 302.) Because Michell fails to plead any specific comments from Roth that demonstrate racial animus based on Michell's pricing, the court finds this evidence insufficient to plausibly allege discriminatory intent. *See Sokolovsky,* 2023 WL 5977298, at *15.

With regard to Michell's allegation that McDonald's evinced discriminatory intent by alleging that his restaurants are dirty, this claim also does not show discriminatory intent. Michell explains that a health inspector found mouse dropping and filth flies, "but the observed pest problem did *not* rise to the level of requiring restaurant closure under established board of health standards." (Am. Compl. ¶ 127(a) (emphasis in original).) Michell alleges that his team "mentioned the pests to Stephen Monahan, McDonald's Franchise Business Partner, who was more interested in getting the restaurant to reopen." (*Id.* ¶ 127(b).) Nevertheless, Michell alleges that "McDonald's wrongfully accused Michell of 'lack of candor in disclosing the full nature' of the violations cited by the New York Department of Health." (*Id.* ¶ 127.) Michell contends this is a "further racial insult to a Hispanic Owner/Operator" because McDonald's is trying "to portray Michell as operating 'dirty restaurants.'" (*Id.* ¶ 303). However, Michell fails to plausibly allege that McDonald's highlighted the negative health reports from his restaurants in "ethnically degrading terms." *See Littlejohn,* 795 F.3d at 312.

Michell's Amended Complaint does not indicate which McDonald's employee accused Michell of "lack of candor" in disclosing the health code violation, or who said Michell was operating "dirty restaurants." (*See* Am. Compl. ¶ 127.) In fact, the Amended Complaint does not clarify whether these quotes are statements from McDonald's or its agents, or Michell's characterizations of

their alleged statements. Even if the court were to assume that McDonald's made these statements, the court finds that they still do not indicate discriminatory intent because they "do[] not explicitly or specifically reference race." *Jackson*, 836 F. Supp. 2d at 94. Further, their "meaning and intent remain subject to interpretation" because McDonald's was entitled to be concerned about the health standards that Michell maintained at his McDonald's restaurants. *See id.* The court agrees with McDonald's that "[n]owhere in Michell's 330-paragraph amended complaint does he identify a single statement by McDonald's that references his race in any way." (Mot at 20.) Accordingly, Michell has failed to allege discriminatory intent via direct evidence. *Dames*, 2023 WL 5047776, at *3.

The court now turns to Michell's indirect evidence of discriminatory intent. "An inference of discrimination may be drawn through observation of similarly situated individuals who are not members of the relevant protected class being treated differently than plaintiffs." *Dames*, 2023 WL 5047776, at *3 (citing *Lizardo*, 270 F.3d at 104); *accord Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) ("A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case."). "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (first quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); and then citing *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000) and *McGuinness v. Lincoln Hall*, 263 F.3d 49 (2d Cir. 2001)). "What is key is that they be similar in significant respects." *Id.* A plaintiff bears the

44

burden to plausibly allege that that persons of a different race who were "allegedly afforded preferential treatment" are similarly situated in all material respects. *Myers v. Doherty*, No. 21-3012-CV, 2022 WL 4477050, at *2 (2d Cir. Sept. 27, 2022); *Ruiz*, 609 F.3d at 493-94.

"Whether two people are similarly situated is usually a question of fact for the jury." *Lizardo*, 270 F.3d at 101 (citing *Graham*, 230 F.3d at 39). Accordingly, the comparator inquiry "presents a question of fact, rather than a legal question to be resolved on a motion to dismiss." *Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019).

Michell alleges that he was treated differently from three white McDonald's franchisees who he claims were similarly situated. *First*, Michell compares his situation to a white "Vermont franchisee (Coughlin)." (*See* Am. Compl. ¶¶ 91 (describing Michell's situation), 92 (describing Coughlin's situation).) Michell alleges that "in June 2022 [Coughlin] agreed to pay $1.6 million to settle EEOC claims of sex discrimination, harassment, and retaliation on behalf of restaurant employees who alleged the franchisee's restaurant manager inappropriately touched their genitals, breasts, and buttocks among other misconduct." (*Id.* ¶ 92.) He further alleges that "Coughlin, who is white, remains a McDonald's Owner/Operator and was not sanctioned by McDonald's in the way McDonald's is trying to sanction Michell." (*Id.*) *Second*, Michell also alleges that two New York-based white franchisees, Tom Parker and Paul Hendel, are also comparators. (*See id.* ¶ 120.) Michell alleges that Parker and Hendel each "settled with New York City after being charged with comparable labor law violations, and their cases had generated similar media publicity, but to Michell's knowledge, McDonald's had not sanctioned them." (*Id.*)

Michell plausibly asserts that McDonald's declined to sanction franchisees Coughlin, Parker, and Hendel for similar violations

of McDonald's standards and policies as Michell because they are white. (*See id.* ¶¶ 92, 120.)[22] Further, the court finds that Michell has plausibly pleaded that Coughlin is "similarly situated [to Michell] in all material respects": both Coughlin and Michell are McDonald's franchisees; both faced labor and employment claims brought by government agencies; both settled those claims for roughly $1 million; and both received negative media attention in the same five-month period. (*See id.* ¶¶ 91-92.) *See Lincoln Hall*, 263 F.3d at 53-54. At the pleading stage, the court finds that Michell has raised an inference of race-based discrimination based on McDonald's preferential treatment of similarly-situated white franchisees.

Accordingly, the court denies McDonald's motion to dismiss Count VII.

### 2.   Retaliation

Section 1981 also protects "action taken to protest or oppose statutorily prohibited discrimination, and may take the form of either formal or informal complaints." *Orrego v. Knipfing*, 564 F. Supp. 3d 273, 284 (E.D.N.Y. 2021). To make a *prima facie* retaliation case under 42 U.S.C. § 1981, a plaintiff must demonstrate that (1) he engaged in statutorily protected activity, (2) defendants were aware of the activity, (3) the plaintiff suffered a materially adverse action, and (4) there was a causal connection between the plaintiff's activity and adverse action taken by the defendant. *See Lizardo*, 270 F.3d at 105. A plaintiff can demonstrate causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through

---

[22] However, the same cannot be said about Michell's allegation that McDonald's "treat[ed] his daughter Larisa Michell differently from the white children of white operators in the Next Gen program" because Michell fails to provide specific operator(s) as comparison and only speaks to the general population of white operators. (*See* Am. Compl. ¶ 299.)

other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam).

A defendant's counterclaim can be unlawful retaliation "only if [the] counterclaim is baseless." *Pawlowski v. Kitchen Expressions Inc.*, No. 17-CV-2943 (ARR) (VMS), 2017 WL 10259773, at *5 (E.D.N.Y. Dec. 15, 2017); *Romero v. Bestcare, Inc.*, No. 15-CV-7397 (JS) (GRB), 2018 WL 1702001, *5 (E.D.N.Y. Feb. 28, 2018) ("baseless" claims are those "designed to deter claimants from seeking legal redress"), *report and recommendation adopted*, 2018 WL 1701948 (E.D.N.Y. Mar. 31, 2018) (collecting cases). The "district courts in this Circuit have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions." *Kim v. Lee*, No. 22-61, 2023 WL 2317248, at *3 (2d Cir. Mar. 2, 2023) ("To be baseless, a counterclaim must have no basis in fact or sound reason.") (summary order).

McDonald's moves to dismiss Michell's retaliation claim, arguing that Michell has failed "to show that McDonald's had retaliatory intent or was motivated by racial animus." (Mot. at 23.) Further, McDonald's argues that neither its pre-counterclaim conduct nor its counterclaim constitutes adverse action. (*Id.* at 23-24.) In response, Michell contends that McDonald's escalated its harassment "after he complained of disparate treatment," (Opp. at 24), and that McDonald's filed its counterclaim in retaliation, (*id.* at 23). Michell also argues that "the retaliation itself need not be motivated by" racial animus. (*Id.* at 24.)

The court first addresses Michell's retaliation allegations from before McDonald's' filing of its counterclaim, then turns to the counterclaim itself.

a. *Pre-counterclaim*

The court inquires as to the timeline of the events cited by Michell to support his retaliation claim because "[i]t is axiomatic that for any conduct to be deemed actionable as retaliation, it must occur *after* the protected activity." *Sealy v. State Univ. of New York at Stony Brook*, 408 F. Supp. 3d 218, 227 (E.D.N.Y. 2019), *aff'd*, 834 F. App'x 611 (2d Cir. 2020) (emphasis added).

Michell asserts that starting in November 2022, McDonald's demanded that Michell sell off his McDonald's restaurants at prices below market value. (*See* Am. Compl. ¶¶ 97, 204.) In his opposition, Michell cites paragraph 109 of the Amended Complaint to argue that he "first complained to Chiczewski in November 2022," (Opp. at 25), but nowhere in that paragraph does Michell allege a month or year when he complained to Chiczewski, (*see* Am. Compl. ¶ 109). Michell merely alleges that he complained of disparate treatment "[i]n one or more of their conversations after Chiczewski criticized Michell for the adverse publicity following Michell's resolution of the DCWP case." (*Id.*) Michell also claims to have complained of McDonald's disparate treatment of his daughter Larisa as part of these unspecified conversations with Chiczewski. (*See id.* ¶ 110.) McDonald's alleged November 2022 demand that Michell sell his restaurants does not qualify as a materially adverse action because Michell fails to plausibly allege that he engaged in a protected activity before that date. *See Sealy*, 408 F. Supp. 3d at 227. (Am. Compl. ¶¶ 112-13 (noting that while "Michell was shocked and outraged" by McDonald's demand, he indeed negotiated with McDonald's to sell his restaurants, to no avail).)

In a Change of Status letter dated January 11, 2023, McDonald's informed Michell that he "no longer [met] the National Franchising Standards" because Michell failed to "properly communicate and be collaborative with the Stamford Field Office." (*Id.* ¶ 115.) Because the Amended Complaint does not specify the date(s)

prior to February 17, 2023 on which he allegedly complained to Chiczewski, the court is unable to assess whether McDonald's determination that Michell was not in compliance with its New Owner/Operation Involvement Standard was a response to the DCWP claims or a response to Michell's complaints of disparate treatment after McDonald's learned about the DCWP settlement. The first date on which Michell plausibly alleges that he engaged in a protected activity is February 17, 2023. (*See id.* ¶ 111.) In a February 17, 2023 email to Chiczewski, Michell explained that he did not inform McDonald's about the DCWP claims because "labor issues at franchisee stores are franchisee matters" and "McDonald's has always taken the position that they are not a joint employer, and the franchisees are independent business owners." (*See id.* ¶¶ 111, 101.) Michell copied the president of the MHOA and other "higher ranking officers at McDonald's corporate" to "highlight his concerns of disparate racial treatment," which he allegedly put in writing in the same email. (*Id.* ¶ 111.) Accordingly, Michell's February 17, 2023 email challenging his disparate treatment was a protected activity. *See Orrego*, 564 F. Supp. 3d at 284 (concluding that emailing complaints of racial discrimination are a protected activity under Section 1981).

Michell mechanically alleges that several of McDonald's actions were "arbitrary and capricious, unfair, unreasonable, *retaliatory*, discriminatory, made in bad faith, [and] lack[ing] proper motive." (*See* Am. Compl. ¶¶ 204 (demand that Michell sell all his McDonald's restaurants below market value), 205 (treatment of Larisa in the Next Gen program), 206 (determination that he was not in compliance with Owner/Operator Involvement Standard), 207 (threat that his remaining franchise agreements would not be renewed after they expired), 208 (demand that Michell sell all his restaurants before their franchise terms expired), 209 (determination that Michell's Special Venues would not be renewed) (emphasis added).) However, Michell fails to meet his burden of plausibly pleading that there was a "causal connection" between

his protected activity and these alleged adverse actions. *See Lizardo*, 270 F.3d at 105; *Dixon v. City of New York*, No. 3-CV-343 (DLI) (VVP), 2008 WL 4453201, at *12 (E.D.N.Y. Sept. 30, 2008) ("As to indirect proof of causation by temporal proximity, courts have consistently found that temporal proximity in the absence of other evidence is often insufficient to establish a *prima facie* case of retaliation."), *on reconsideration,* No. 3-CV-343 (DLI) (VVP), 2009 WL 1117478 (E.D.N.Y. Apr. 24, 2009).

### b. Counterclaim

The court now turns to whether Michell plausibly alleges that McDonald's retaliated against him by filing a counterclaim in this action.

*First,* when Michell brought this suit alleging discrimination under Section 1981, he engaged in a statutorily protected activity. *See Orrego*, 564 F. Supp. 3d at 284. (*See generally* Compl.) Section 1981 prohibits inhibiting a racial minority's right "to sue." 42 U.S.C. § 1981(a). Michell filed his original Complaint alleging disparate treatment on May 9, 2024. (*See* Compl. ¶¶ 212-47.)

*Second*, Defendants became aware of Michell's lawsuit against them when all Defendants waived service on June 14, 2024. (*See* Waivers of Service (Dkts. 6-10).) *See Chapman v. New York State Div. for Youth*, 227 F.R.D. 175, 181 (N.D.N.Y. 2005) ("In its most basic form, a waiver of service is in lieu of the service of a summons and complaint.").

*Third,* Michell alleges that he suffered a materially adverse action when McDonald's brought a counterclaim against him on October 10, 2024. (*See* Defs.' Answer and Countercl. ¶¶ 73-79; Am. Compl. ¶¶ 160-63.) Specifically, McDonald's alleges that Michell is in material breach of his franchise agreements and seeks a judgment declaring that Michell is in breach so that McDonald's may exercise its right to terminate the agreements. (*See* Defs.' Answer and Countercl. ¶¶ 9, 79.)

McDonald's' counterclaim may support Michell's retaliation claim only if it is "baseless." *Pawlowski*, 2017 WL 10259773, at *5. McDonald's points to several provisions of the material breach section of the Franchise Agreement that undergird its declaratory judgment claim. (*See* Defs.' Answer and Countercl. ¶¶ 31 (citing Franch. Agr. ¶¶ 11(e) and 18(i) concerning use of McDonald's marks without permission), 33 (citing Franch. Agr. ¶ 11(o) concerning engaging in conduct that reflects materially and unfavorably on McDonald's reputation), 34 (citing Franch. Agr. ¶ 18, which gives McDonald's the right to terminate the agreement upon material breach).) McDonald's also provides factual support for its allegation that Michell breached the Franchise Agreement.[23] (*See id.* ¶¶ 60 (alleging that Michell's bid to become master concessionaire at Bradley Airport named McDonald's as the fast casual burger concept without McDonald's permission), 46-57 (describing media reports and legal settlements concerning Michell's restaurants that allegedly harmed McDonald's' reputation), 69 (alleging that Michell failed to comply with certain labor laws).)

Accordingly, the court finds that McDonald's request for declaratory relief based on Michell's alleged breaches of the Franchise Agreement is not baseless. Because Michell's retaliation claim based on McDonald's counterclaim can survive only if the counterclaim is baseless, and because McDonald's counterclaim is *not* baseless, Michell's retaliation claim must be dismissed. *See Pawlowski*, 2017 WL 10259773, at *5. The court grants McDonald's motion to dismiss Count VIII.

---

[23] "[T]he court construes [McDonald's] counterclaim in the light most favorable to the counterclaimant and accepts all well-pleaded factual allegations as true." *Garza Cantu v. Flanigan*, No. 5-CV-3580 (DGT) (RLM), 2007 WL 2480119, at *3 (E.D.N.Y. Aug. 27, 2007) (citing *Tassy v. Brunswick Hosp. Center, Inc.*, 296 F.3d 65, 67 (2d Cir. 2002)).

## IV. LEAVE TO AMEND

"A party may amend its pleading once as a matter of course," then "only within the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)-(2). "The court should freely give leave when justice so requires." *Id.* Generally, requests to amend should be granted absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[O]utright refusal to grant the leave without any justifying reason appearing for the denial" is an abuse of discretion. *Id.* "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999). "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Id.*

Michell requests leave to further amend his pleadings "[s]hould the Court grant Defendants' motion in whole or in part." (Opp. at 25 n. 28; *see also* Pl.'s PMC App.) Michell has already amended his complaint once with the court's permission. (*See generally* Compl.; Am. Compl; Nov. 4, 2024 Order.) The court grants Michell leave to replead his common law fraud claim (Count IV) and retaliation claim (VIII) because the pleading defects identified in those claims concerning particularity and causation can potentially be cured by better pleading. *See Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986) ("[P]laintiffs must be allowed an opportunity to amend to remedy deficiencies under Rule 9(b).").

However, the court denies Michell leave to replead his contract claim (Count III) and promissory estoppel claim (Count V) because these claims ask this court to contravene fundamental principles of contract law. *See Cuoco v. Moritsugu*, 222 F.3d 99,

112 (2d Cir. 2000) (reasoning that when the problem with a pleading is substantive, "better pleading will not cure it"); *Eckhardt*, 193 N.E.3d at 194 ("implied covenant of good faith cannot overrule or modify the express terms of a contract"); *Kent Literary Club*, 338 Conn. at 210 (promissory estoppel claim cannot contradict an enforceable contract).

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion to dismiss Counts III, IV, V, and VIII is GRANTED, and Defendants' motion to dismiss Counts VI and VII is DENIED. Counts IV and VIII are DISMISSED without prejudice. Counts III and V are DISMISSED with prejudice. The court GRANTS Michell leave to file a second amended complaint and DIRECTS Michell to amend his pleadings within 30 days of this Memorandum & Order. Michell's request for a pre-motion conference is DENIED as moot.

SO ORDERED.


Dated:    Brooklyn, New York
          September 23, 2025


                                        s/Nicholas G. Garaufis
                                       ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge